## Joseph M. Cormack v. Thomas Marshall.

### Gen. No. 4,492.

1. CUSTODY OF CHILD—*what not sufficient ground to deny, to father.* The mere fact that the father of a child is a man of small means is not sufficient grounds for denying him its custody.

2. CUSTODY OF CHILD—*when parol contract for, invalid.* A parol contract by which the father of a child confers the right of custody of such child upon another, is not binding.

*Habeas corpus* proceeding. Error to the Circuit Court of De Kalb County; the Hon. CHARLES A. BISHOP, Judge, presiding. Heard in this court at the April term, 1905. Reversed and remanded with directions. Opinion filed August 1, 1905.

A·. D. EARLY, for plaintiff in error.

CARNES, DUNTON & FAISSLER and CLIFFE & CLIFFE, for defendant in error.

MR. JUSTICE FARMER delivered the opinion of the court.

At the October term, 1903, of the Circuit Court of De Kalb County, a writ of *habeas corpus* was issued upon the petition of plaintiff in error for the custody of ·his infant son, James Kimball Marshall Cormack. The petition alleged that petitioner was father of the child and that it was illegally detained by its grandfather, Thomas Marshall, defendant in error. A hearing was had on the return to the writ and answer to the return, and an order and judgment entered by the court, finding that it was for the best interests and welfare of said infant that defendant in error have its care and custody, that he was entitled to it, and remanding the child to his care, custody and control.

On the supposition that an appeal or writ of error would not lie from that judgment, plaintiff· in error presented an original petition to the Supreme Court for a writ of *habeas corpus*. By the return to the writ in that court, defendant in error set out the record, proceedings and judgment of the Circuit Court, and relied upon them as a bar to the proceeding in the Supreme Court. The return also set out the circumstances of the child coming to the possession of defendant in error, and why he claimed to be entitled to retain the care and custody of it. The Supreme Court referred the cause for the taking of testimony, and upon consideration of the case after the testimony was reported, concluded that the judgment in the proceeding in the Circuit Court was a ·bar. It was held to be a final judgment and that a writ of error would lie to review it. Cormack v. Marshall, 211 Ill. 519. Thereupon plaintiff in error sued out this writ of error. It is unnecessary for us to discuss

the question of the right to prosecute the writ of error, as that question was settled by the Supreme Court in its opinion, where a large number of cases on the subject were cited and reviewed, and besides, this right is not questioned here. Nor will it be necessary for us to make a detailed statement of all the facts as they will be found elaborately stated in the opinion of the Supreme Court before referred to. True, as stated by counsel for defendant in error, the evidence taken and reported to the Supreme Court was not the evidence heard by the Circuit Court, but we take it from the statement of facts made by that court, that there was no material difference in the testimony taken on the two occasions. One of the most material questions to be determined is whether plaintiff in error was a fit and capable person to have the care, custody and control of his own child. He is a minister of the gospel in the M. E. Church and the evidence shows him to be a man of education and culture, now aged fifty years. Besides attending the State Agricultural College of Kansas five terms, he graduated in the classical course in the Northwestern University, is also a graduate of The Garrett Biblical Institute and was ordained an elder in 1883. He was married to Jennie Marshall. the mother of the infant whose custody is the subject of this litigation, in 1884. She was the daughter of defendant in error. Two children were born of this marriage, Joseph, now about twelve years old, and Kimball, the child in controversy, who was born February 18, 1900, in the Presbyterian Hospital in Chicago, where the mother had gone to remain during her confinement, and where she died the third day of March following. The infant was left in the hospital for a few weeks to be nursed and cared for there. A few days after the death of Mrs. Cormack, plaintiff in error received word that his father was very ill in Kansas. He went there at once and remained there until after his father's death and burial. The child was not doing very well, and on his return home Mrs. Ernest, a sister of the deceased Mrs. Cormack, agreed to take and care for it if plaintiff in error would secure a

Cormack v. Marshall.

woman to help her.   This he did, and he and Mrs. Ernest
went together to the hospital, got the child and took it to
Mrs. Ernest's home.   The woman, plaintiff in error had
employed to help her, left after a few days, and the child
being in poor health and Mrs. Ernest having an infant of
her own to care for, took Kimball to her parents, defendant
in error and his wife, and left him there.   This she did
without the knowledge of plaintiff in error.   When he
learned the child was at its grandparents' he visited it
there.   There it rapidly regained its health and became a
strong and vigorous infant.   Plaintiff in error testifies,
that after it had been there some two months or more, he
told the grandparents he would want to take the child
away, and that they requested him to leave it until it was
stronger.   He did not, however, have any arrangements
made for a place to take it, to have it cared for at that
time.   He continued to visit it at frequent intervals until
his second marriage, which occurred in September, 1902.
After that time, wishing to take the child into his own
family and under his own care, he requested defendant in
error to deliver it to him, which request was refused, and
thereupon this proceeding was begun.

It is not denied that both parties to this controversy
were fit and proper persons to have the care, custody and
control of a child.   The grounds upon which defendant in
error insists he has a right to retain the custody of the
child are set forth in his return to the writ, and in sub-
stance the material parts are that plaintiff in error lived
some distance from his deceased wife's relatives and prac-
tically abandoned the child to their care, that defendant in
error was in excellent financial condition, owning, besides
other real estate and personal property, between six and
seven hundred acres of farm land, free from incumbrance,
worth $75 per acre, lives in a large and convenient house;
that he and his wife are each about seventy-one years of
age, in good health, and enjoying their home life with an
ample income to provide for all the reasonable wants of
their family during the remainder of their lives; that when

the child was about one year old, he had a talk with its father about its care and custody, in which the father said defendant in error was as much responsible for the care of the child as he was and that he replied he would keep it; that defendant in error and his wife had become much attached to the child, and that it was his purpose to furnish it all the reasonable advantages of education and development that his means would furnish, and suitably provide for it out of his estate at his death. The return further averred that plaintiff in error was a minister of the Methodist Episcopal Church and had been so occupied about twenty years; that he was then receiving a salary of $750 per year and use of parsonage; that he had another son and had married another wife about thirty years of age of delicate health; that on account of his profession he was required to move from place to place and had expressed the opinion that he could not keep up the work a great many years; that he was nearly fifty years of age and is now receiving a smaller salary than he had formerly received, on account of not being able to get as good positions as formerly; that he has not sufficient means to procure a home and support his family, but must depend upon his own efforts or contributions from friends to support them, and because of his profession and habits of life is unfitted to earn any considerable income in any other occupation or calling, and that plaintiff in error cannot "reasonably expect with his limited means and prospects to care for and educate such child, either in his own or any other family, in a manner that will secure the best care, development and education of the child."

Counsel for defendant in error disclaim relying on his possession of greater wealth as a sufficient or principal reason why he should be allowed to retain the custody of the child, yet an examination of the return made to the writ will show that the only charge of unfitness of plaintiff in error to have the care and custody of his own child is his limited means. It is true he is not a man of large means, but the evidence shows him to be a frugal man and of good

Cormack v. Marshall.

financial sense and judgment.  He worked his way through college, and obtained his education by his own efforts, unaided from any other source, and although since entering the ministry his salary has ranged from $900 to $750 per annum and house rent, he is the owner of some $3,000 worth of real estate, about the same amount of money loaned, a $2,000 library, $850 cash, household furniture and some other personal property.  All this is the savings, according to the testimony, from his own earnings, except $500 his first wife had when he married her.  If the possession of wealth is to be considered an important element in the determination of the question of a parent's fitness to have the care and custody of his own child, even then, we think, it could not be reasonably said that plaintiff in error is disqualified for that duty.  There are thousands of parents with less wealth supporting much larger families of children than plaintiff in error has, and the fact that this is so has never been supposed to be a reason why their children should be taken from them and their care, custody and education confided to some one who has larger wealth. While this is essentially a commercial age, we have not yet reached that stage where parents may not have the control and custody of their own children and the direction of their education, the development of their characters and habits and the enjoyment of their society and companionship, if they possess the other necessary requisites of fitness, although lacking in wealth.  The possession of some property by the person having the care and control of a child may be quite necessary, and the possession of much property very desirable, but there are other considerations in the raising, education and development of children quite as desirable. The evidence shows the grandparents of the infant, Kimball, to be most excellent people, much attached to the child and very fit for persons of their years to have the care and custody of him if there were no other person having superior rights thereto.  But however good and kind they may be and however strongly attached to the child, aside from their wealth, they possess no qualities of fitness

superior to those of the father. Indeed, we think from the evidence in this record, the best interests of this child, aside possibly from those of a financial nature, would be promoted by giving him to the custody of his father. The good influence upon a son of an educated, refined father, of high Christian character, are not to be lightly esteemed as factors in the development of a noble and useful manhood. Such influences combined with the ability to supply the reasonable wants are likely to be more potent in the formation of good character than those of mere wealth. It is a matter also of common knowledge that the discipline and restraining influences of aged people upon young children, however estimable and kind they are and however well intentioned they may be, are not usually as productive of good results as those of younger persons. The proof also shows the present Mrs. Cormack to be an educated, refined woman, in sympathy with her husband's efforts to get possession of his child, and willing to take and care for him. It seems clear to us that this is a case where, not only the right of the father to thé custody of the child is shown, but also where, all things considered, the best interests of the child require that custody to be awarded to him. The proof shows the father is and always has been attached to the child, and has never abandoned him nor consented to defendant in error retaining his custody permanently. What is relied upon by defendant in error as establishing such consent and agreement, we think wholly fails to do so. It appears from the evidence that on a number of occasions plaintiff in error talked with defendant in error about taking the child, and the latter was never willing to give him up. Defendant in error testified that on one occasion, when the child was about a year and one-half old, while he and the father were discussing the question of the father taking the child away, he asked plaintiff in error what he was going to do with him, and that plaintiff in error said that he would do just as he had a mind to, and that defendant in error had no right to say anything. He says he replied to plaintiff in error that he had been at con-

Cormack v. Marshall.

siderable expense and during the talk plaintiff in error said he claimed defendant in error was just as much responsible for the child as he was, and that he replied, "All right, if I am I will keep it." Leslie D. Marshall, a son of defendant in error, testified that he heard the latter part of the conversation, and that when his father said he would keep the child, plaintiff in error made no response. Plaintiff in error testified he remembered the conversation referred to by defendant in error and his son, but says the conversation referred to a note his deceased wife's father had given her and which he refused to pay anything on, and that if in any conversation he used the word "responsible" with reference to the child, it had reference to the grandfather being responsible for it while he refused to give it up to the father. By leaving out of the question the testimony of plaintiff in error on that subject, the evidence of defendant in error and his son wholly fail to establish an agreement and consent to relinquish his claim to the care and custody of the child and an agreement that defendant in error might permanently retain it. Moreover, it was held in Weir v. Marley, 99 Mo. 484, that a parol contract of that kind was not binding, and counsel for defendant in error do not contend that if such contract were proven it would be conclusive, but only that it should have "considerable bearing on the question of the custody of the child considered in connection with other questions bearing on the interests of the child."

A number of cases and authorities are cited by counsel for defendant in error in their brief upon the proposition that in disposing of the custody of children the primary object should be what is to the best interest of the child. We do not doubt the soundness of the authorities cited, nor that if the father was such a person as to be unfit, not merely for lack of wealth but for other more important reasons, to have the care and custody of a young child, that a court would not only have the power but that it would be its duty to deny him that care and custody. The Supreme Court said with substantially the same facts before

it that are found in this record : " We regard the rights of the parent as superior to those of any other person, when that parent is a fit person to have the custody of children and is so circumstanced that he can provide the necessaries of life and administer to the requirements of such a charge. The mere fact that some other person may have more money or property in any form is not one that appeals to us. The divine injunction to multiply and replenish the species was not confined to the rich, nor was it intended that the poor should beget the children and the rich should rear them. To recognize such doctrine would be little less than monstrous, and would be in utter disregard of those natural instincts of love and care and interest found in the breast of the parent. * * * While the financial interests of the child are not to be disregarded, they are, likewise, not to be controlling." While it is said by counsel that these expressions of the Supreme Court were not necessary to a determination of the question really passed on by that court, and were not applicable to a discussion of that question, yet they were the deliberate judgment of that court from as full a knowledge of the facts as we possess, and in our opinion these expressions are binding on us here. Besides, they fully accord with our own views, and we most willingly adopt and follow them. They are supported also by Miner v. Miner, 11 Ill. 43; The People v. Turner, 55 Ill. 380; Norval v. Zinsmaster, 57 Neb. 158; Markwell v. Pereles, 95 Wis. 406; Weir v. Marley, *supra*, and Com. v. Briggs, 33 Mass. 203.

The judgment of the Circuit Court is reversed and the cause remanded with directions to that court to award the custody of the child to plaintiff in error.

*Reversed and remanded with directions.*