# September Term, 1910

[No. 6939.]

## WILSON ET AL. V. MITCHELL.

1. **Infants—Custody—Rights of Parent**—The welfare of the child is the primary and controlling consideration by which the court must be guided. But the natural right of the parent is not to be interfered with unless it is made to appear that exceptional circumstances render the parent's custody opposed to the interest of the child.—(465, 466)

The presumption is that the parent is a fit and suitable person to have the nurture and care of his own offspring.—(466-468)

Past misconduct will not disqualify the parent, where at the time the controversy arises his or her life is irreproachable.—(472)

That the mother of a young child, under stress of poverty, sickness and other adversities, committed it in its infancy to the care of the grandparents, that the latter have retained such custody for years, that an ardent affection from them for the child and the child for them, has arisen, that the grandparents must suffer great sorrow at parting with it, that the child (being now of nine years) prefers to remain with them, that they are in every way proper persons to rear it, and of greater financial ability than the mother, that the mother has contracted a second marriage with a foreign citizen, and that the child if committed to her custody will be reared in a foreign country—will not warrant the denial of the mother's application for the child's custody.—(474-477)

The age and declining years of the grandparents, that in their family are no young children, that if the child remains with them it will probably lose its affection and respect for the mother (always maintained and ardently manifested before the controversy arose), and that the mother has a daughter born of a second marriage—enter into the question.—(476, 477)

2. **Divorce of Parents—Awarding Custody of Child—Effect**—A decree divorcing the parents and awarding the custody of the child is necessarily temporary and provisional. Upon the death of the parent to whom the child is awarded, the other becomes immediately entitled to such custody, unless it is shown that such parent is disqualified, or the interest of the child requires a different disposition of its person.—(468, 469)

(454)

3. **Divorce—Effect Inter Alios**—In a controversy as to the custody of a child, between the mother on one side and the grandparents on the other, a decree of divorce granted to the father of the child and awarding to him the child's custody is evidence of the legal separation so declared, but not of the truth of tho allegations, upon which it was founded. Especially is this so where the wife, the party convicted, was, owing to poverty, distance and sickness, unable to make a vigorous defense.—(469, 470)

*Error to Denver District Court*—Hon. CARLTON M. BLISS, Judge.

Messrs. NORTHCUTT & McHENDRIE and Mr. JOHN A. GORDON for plaintiffs in error.

Messrs. BICKSLER, BENNETT & NYE for defendant in error.

This is a *habeas corpus* proceeding instituted in the lower court by June V. B. Mitchell, defendant in error here, against George R. and Linda Wilson, plaintiffs in error, to obtain the custody of her infant son, George Russell Wilson. The writ was duly issued and a return thereto made. The court, upon hearing the evidence, held, "that the welfare and best interests of this child demand that he be brought up in the care of his mother, and in the companionship of his sister," and accordingly ordered plaintiffs in error to deliver the child to the custody of its mother. The case is brought here for review.

In 1898 June Van Buskirk, seventeen years of age, a student of the American School of Dramatic Art, married Francis Sedgwick Wilson, aged about twenty-one years, a graduate of the same school, engaged in the theatrical profession. From this marriage, and on March 17, 1900, George Russell Wilson, the subject of this controversy, was born. George and Linda Wilson, plaintiffs in error, are the paternal grandparents of Russell. The married life of the parents of this child was not congenial.

From the time the child was four weeks old the young mother alone took care of it, and for seven months it was nourished from her breast. The relations of husband and wife became more estranged as time passed, until December, 1900, at which time Francis sent June and the baby to her relatives in Indiana, neither writing her, nor contributing anything to the support of herself or child. In March, 1901, learning that Francis was in Philadelphia, June borrowed money from her relatives and, with Russell, joined her husband, where a reconciliation took place, and they, thereafter, lived together until the spring of 1902. In July, 1901, Francis, taking his wife and baby, visited his brother's family in Nevada, where they remained for six weeks. Linda Wilson was also there. Francis, in the presence of his wife, suggested to Linda that the latter take Russell, and care for him, as it was inconvenient for the parents to do so, giving as his reason their theatrical work, though June, at that time, had never filled a theatrical engagement. Linda Wilson declined to take the child, unless it should be given to her for all time, but to this condition the parents refused to give their consent, and returned to New York. In December, 1901, a second child—a girl—was born to Francis and June. When this child was about two months old, and seriously sick, Francis, in anger, took Russell, and, going out in a severe storm, remained away with him all night. The father's absence with the boy, and the serious illness of the girl, alarmed the mother greatly, and leaving the baby in charge of a friend the mother went out in the storm, searched for, and found, her husband and son, taking the latter home. Upon the return of Francis he advised his wife that he had previously been in correspondence with his father, George Wilson, and had determined to place the boy with the latter; that

June must support herself, as he could not, and would not longer do so. Within a few days thereafter Russell was taken ill with pneumonia, and while he was convalescent, the little girl died. Francis thereupon insisted that Russell be placed with the parents of the former, at least, temporarily, threatening to run off with the child and so place him if the mother did not consent. The mother persistently refused to surrender her boy, but finally upon the representation that the child's welfare, on account of the slow recovery from pneumonia, and' the heat of New York in summer, and the necessity that she support herself, consented to place the child with such grandparents temporarily, as she claims.

Francis S. Wilson, the father of Russell, achieved considerable success in his profession, earning, even in his early career, from $75.00 to $100.00 per week. He seemed, however, wholly lacking in financial judgment, or ability to conserve his resources. During the time he and June lived together, notwithstanding his salary and many hundreds of dollars, from time to time advanced to him by George R. Wilson, he was never able to meet his obligations, and the environment of' their home life was miserable poverty and domestic infelicity. June was frequently without food, and was under the necessity of borrowing small sums of money from her friend, Mrs. Cook, with which to buy food and medicine for Russell,

In April, 1902, June borrowed money from her friends, with which she paid her expenses from New York to Sioux City, Iowa, where she took Russell and left him with his grandmother, Linda Wilson. Nothing was said by, or to, her about the permanent surrender of the child, though plaintiffs in error claim that their son assured them, that they should have the boy permanently. Shortly thereafter the parents of Russell ceased to live together, and the

mother secured a position on the stage and from her salary contributed regularly to the support of Russell. She also visited the child in 1902, and the following winter, at her expense, the child and its grandmother visited her in Minneapolis. In the spring of 1903 defendant in error was advised that the grandmother had asserted her intention of permanently keeping Russell. The mother thereupon induced the grandmother, at the former's expense, to take the child to Chicago, ostensibly for a visit with the mother. The latter secured possession of Russell and fled with him to New York, thence to England, and later to the continent. The father of the child, financed by the grandfather—one of the respondents here—pursued, and finally, at St. Gallen, Switzerland, overtook the fleeing mother with her child. A conference was had and the mother assented—as she now claims, by reason of threats and pleas concerning the child's welfare, and the fact that she had exhausted her finances—to return to America and surrender the child to the grandfather, which she did in August, 1903. Upon this trip she was accompanied by the child's father, and arriving in New York, was met at the pier by George R. Wilson, who took possession of the child, and thereafter told its mother that she should never again have possession of her son. Within a few days George R. Wilson conveyed Russell to Sioux City, Iowa, and delivered him to Linda Wilson, who has retained him in her custody from that time to the present. In her flight to Europe defendant in error had expended the money she had saved, that which she had borrowed from friends, and raised from pawning some of her clothing and jewelry. After Russell was taken from her, she was alone in New York, had no lawyer or any one with whom to advise, was greatly in debt, and had no employment. She

was, however, soon thereafter engaged to play in London, and left for that point October 9th. Just previous to her departure for England, her husband instituted a divorce proceeding, charging her with serious offenses against the marital obligations committed between August, 1902, and the summer of 1903, and praying for the custody of Russell. In that suit summons was duly served and the defendant in error employed counsel, filed an answer, denied any wrongdoing, and likewise asked for the custody of the child. Upon arrival in England defendant in error was taken ill, underwent a serious operation, and was unable to resume her theatrical engagements until May, 1904. After leaving the hospital defendant in error was cared for by Mrs. Clemow, with whom she lived until 1906. In June, 1904, the divorce suit came on for trial and defendant therein, failing to appear other than by attorney, a decree of divorce was granted in favor of the plaintiff, with a rule that defendant show cause on or before September 23rd following, why the decree should not be made absolute. Though advised of the decree *nisi*, no further appearance was made on behalf of defendant, and the decree was made absolute in accordance with the rule, and the custody of Russell was awarded to the father. At that time Russell was not within the jurisdiction of the court in which the decree was entered, nor has he since been. In July, 1904, Francis visited England, and there met the defendant in error, and told her that if she did not give him, or send him, $500.00 by the first of October, he would never permit her to hear from Russell, or see him again. He stated that the money was not for himself, but for George R. Wilson who had advanced money on the divorce case, and had expended large sums in having her followed to Europe and repossessing himself of the child. The defendant in error was desirous of seeing her son,

and expressed an intention of visiting America for that purpose, but was assured by Francis that it was unnecessary, as he would bring Russell to England during the summer.

September 30th June wrote to Francis advising him that she had been ill, unable to earn money, and could not send the $500.00 demanded. Previous to this time Linda Wilson had written regularly to June, giving news of the child's health and progress, but in November she ceased writing, and notwithstanding frequent letters and cablegrams for news of her son, June had not a word until March, 1905, except an anonymous letter, and a letter written at the request of Linda Wilson by her nephew. About the middle of March, June received a letter from Francis demanding $1,000.00 to pay the expenses of Linda Wilson bringing Russell to England. Frantic with the desire to see her child, June borrowed from friends, and cabled to Francis the sum of eighty pounds sterling. About three weeks later she received a letter demanding an additional amount in order for his mother, Linda Wilson, to make the trip with the boy. Not complying with this last request, she later received a cable message signed by Francis, reading: "My will or none; will bring mother." April 24, 1905, June had a letter from Francis saying, that he had tried to get his mother to come with the boy to New York, so that he might take the child to England, but that his mother had taken Russell and gone to California. Two days after the receipt of this letter Francis arrived in London and immediately communicated with June, making an appointment and expressing his sorrow that he had not been able to bring Russell. April 27 he called, and, in the presence of Mrs. Clemow, broke down, cried and expressed his regret to his divorced wife, for all the wrong he had done

and his wish to atone therefor. After leaving he wrote and sent to June the following letter:

"DEAR JUNE—After leaving you I have been thinking how I could arrange the best possible plan, for all concerned, of solving this most regrettable muddle.

"Their round-trip passage must be booked, which will incur an outlay of at least $300. You can inquire—their trip from San Francisco to New York will require the best part of $150, and she should have at least $150 given her in New York for incidental and many little expenses which will arise—this totals $600 —and you can give *her* the balance, $400, when she arrives. I feel positive that there will be no hitch, as I wrote her a very forceful letter telling her if she did not come—if I sent for her—I should take Russell away from her on my return to America.

"Furthermore, I will give you this promise: that if my mother should fail to do as I ask in this instance I will immediately on my return to America get Russell and bring him to you, leaving him in your charge to educate and in a refined atmosphere. He bids fair to be too brilliant a man to raise in a half-way manner. I am telling you just how I feel. It has been on my mind for some time. After seeing you to-day in your surroundings I feel that you are the proper one to have him in charge. Don't think me ungrateful in expressing myself this way in regard to my mother; we owe her much, and I wish to try and atone for some of the wrong I have done you; you were far from being wholly to blame—we were equally at fault. This letter you may keep.

"Am so sorry I am not able to advance the $200 at the present time and show *my* good faith, but my money is so placed that I cannot get at it, excepting were I in New York. If you care to advance £40

more, do it immediately so I will be able to get it off on Saturday morning's boat; have it here by noon to-morrow if you can. Believe me, I am as anxious to have Russell with me as you are.

"Sincerely,

"FRANCIS S. WILSON."

Thereupon June borrowed from her friend Mrs. Clemow, the sum of forty pounds sterling, which was transmitted to, and received by, Francis. May 8th and 15th Francis wrote June, conveying the idea that he was making an effort to carry out his promise. The child was not brought, however, nor did June have further word from Francis. Soon thereafter June advised Linda Wilson of the advancement of this money to Francis and the purpose thereof, and subsequently discussed the matter with both George and Linda Wilson.

By strict economy defendant in error discharged a portion of her indebtedness, and in the summer of 1906 made the trip from London to California, and visited for six weeks with her son at the home of Linda Wilson. Russell was very affectionate, and at that time manifested great love and affection for his mother, and has ever done so, until the institution of this suit, since which he has exhibited toward her an aversion. George Wilson testified that this aversion was caused by the fact that June had caused the Wilsons to be shadowed by detectives. Russell, in physical appearance and temperament, is like his father, and has characteristics very much the same, and the grandparents are pursuing the same methods with him as they did in rearing his father.

On her visit to the Wilsons in California in 1906, June said, and did, nothing relative to a change of Russell's custody, being, as she explains, still in debt and without a home. During all these years

the mother, almost every month, and sometimes oftener, transmitted for her boy, to Linda Wilson, money, packages of clothing and presents, continuing practically until the institution of this suit.

Defendant in error returned to London in the fall of 1906, and there continued her theatrical career until December, 1907, when she married Percy J. Mitchell, her present husband, and retired permanently from the stage. In June, 1908, Mr. Mitchell endeavored to induce Linda Wilson, with Russell, to visit the Mitchells during the summer in England, offering to pay all the expenses, basing this request upon the great affection Mrs. Mitchell had for her son and her longing for the boy. This request was denied by a letter from George Wilson. Before her marriage to Mr. Mitchell, June acquainted him with the divorce proceedings, the result thereof, and the whereabouts of her child, and her great desire to again possess him. Mr. Mitchell himself, testified that he was advised of these matters; that his sympathies were at once enlisted, and that he held himself ready to assist his wife, financially and otherwise, to obtain the custody of the child, and so advised her, but before arrangements could be made for mother and son to be re-united, Mrs. Mitchell became a prospective mother, and a daughter was born of her second marriage early in December, 1908. After the daughter's birth, defendant in error planned to come to America as soon as possible, and arrange for taking Russell to London, but the serious illness of her husband, and the tender infancy of the little girl, delayed the matter.

Francis Sedgwick Wilson died February 22, 1909, and in May Mrs. Mitchell came to this country with a determination of obtaining the custody of Russell. Linda Wilson, with Russell, was residing in Alameda County, California, and it was there Mrs.

Mitchell first instituted *habeas corpus* proceedings to regain the custody of the child. Before the service of the writ, Linda Wilson learned that defendant in error was in this country, and suspecting her mission, gave Russell into the custody of his uncle, and sent him to his grandfather, George R. Wilson, at Lamar, Colorado. Defendant in error following here, instituted these proceedings June 17, 1909.

George R. Wilson is in his sixty-first year, and Linda Wilson is past sixty years of age. From 1902 to 1905 Linda Wilson lived with the child, in three different families, in three different homes in Sioux City, while her husband lived in Colorado. Being unable to live in Colorado, on account of her health, Linda Wilson, with the child, went to California, George R. Wilson making his home in this state, with the exception of about one year and nine months, which he spent with his wife and Russell in California. He intends, however, as soon as he can dispose of his business interests in Colorado, to take up his abode with his family in California, and there build a permanent home. Prior to June, 1909, he had not seen either his wife or Russell for nearly two years. George R. Wilson has property of the approximate value of $75,000.00, and it is the desire of the plaintiffs in error to adopt Russell as their own and make him their heir equally with their only living child, a son. Plaintiffs in error are members of the Congregational church and have the respect and esteem of those who know them.

Mr. Mitchell, the present husband of defendant in error, is an educated Englishman, a graduate of the London Technical College, an engineer by profession, at present engaged in profitable contracting; carries life insurance in the sum of $100,000.00; has made a substantial marriage settlement upon his wife and allows her $5,000.00 per annum for household

expenses and clothing; is thirty years of age, a member of the Church of England, and is anxious that his wife shall have the custody of her son Russell; promises to treat the boy as his own child, bring him up with his own daughter, sending him to the best schools in England. Reference will hereinafter be made to other evidence necessary to a proper consideration of this case.

Mr. JUSTICE WHITE delivered the opinion of the court:

In controversies affecting the custody of an infant, the interest and welfare of the child is the primary and controlling question by which the court must be guided. This rule is based upon the theory that the state must perpetuate itself, and good citizenship is essential to that end. Though nature gives to parents the right to the custody of their own children, and such right is scarcely less sacred than the right to life and liberty, and is manifested in all animal life, yet among mankind, the necessity for government has forced the recognition of the rule, that the perpetuity of the state is the first consideration, and parental authority itself is subordinate to this supreme power. It is recognized that: "The moment a child is born, it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated by its duty of protection, to consult the welfare, comfort and interest of such child in regulating its custody during the period of its minority."—*Mercein v. The People,* 25 Wend. 63, 103; *McKercher v. Green,* 13 Col. App. 271.

But as government should never interfere with the natural rights of man, except only when it is essential for the good of society, the state recognizes, and enforces the right which nature gives to parents

(30)

to the custody of their own children, and only supervenes with its sovereign power when the necessities of the case require it. The experience of man has demonstrated that the best development of a young life is within the sacred precincts of a home, the members of which are bound together by ties entwined through "bone of their bone and flesh of their flesh"; that it is in such homes and under such influences that the sweetest, purest, noblest, and most attractive qualities of human nature, so essential to good citizenship, are best nurtured and grow to wholesome fruition; that when a state is based and builded upon such homes, it is strong in patriotism, courage, and all the elements of the best civilization. Accordingly these recurring facts, in the experience of man, resulted in a presumption establishing, *prima facie,* that parents are in every way qualified to have the care, custody and control of their own offspring, and that their welfare and interests are best subserved under such control.

Thus by natural law, by common law, and likewise the statutes of this state, the natural parents are entitled to the custody of their minor children, except when they are unsuitable persons to be entrusted with their care, control and education, or when some exceptional circumstances appear which render such custody inimical to the best interests of the child. While the right of a parent to the custody of its infant child is, therefore, in a sense contingent, the right can never be lost or taken away so long as the parent properly nurtures, maintains and cares for the child.

*In re Neff et al.,* 20 Wash. 652, 56 Pac. Rep. 383, 384, it is said: [The father] "has the natural and legal right to the custody and control of the children, unless so completely unfit for such duties that the

welfare of the children themselves imperatively demanded another disposition of their custody."

In *Miller v. Wallace*, 76 Ga. 479, 486, it is said:

"*Prima facie,* the right of custody of an infant is in the father, and when this right is resisted, upon the ground of his unfitness for the trust or other cause, a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs. 'A clear and strong case' must be made to sustain an objection to the father's right."

And in *McKercher v. Green, supra,* the doctrine is announced that, save in exceptional cases, where it is clear the welfare of the child demands otherwise, the parent's right to the custody is paramount, and should be recognized.

In *United States v. Green,* 3 Mason's Rep. 482, 485, the court, speaking through Justice Story, after declaring that in a general sense the right of the father to have the custody of his infant child is certain, continues: "But this is not on account of any absolute right of the father, but for the benefit of the infant, the law presumes it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education."

The rule announced in 29 Cyc., p. 1603, is that:

"The existence of circumstances which would deprive the parent of the right to custody of the child, such as unfitness, inabilty to care for it, or relinquishment of the parental right of custody, will not be presumed but must be proved by the person opposing the parent's right." It is also there announced that the place selected by a parent for the care and support of his children is presumed suitable, and a person claiming otherwise has the burden of proof.

We are firmly of the opinion that in all cases of this character the presumption is, that the parents

are fit and suitable persons to be entrusted with the care of their minor children, and that the interests and welfare of such children are best subserved when under such care and control; that such presumption is like unto the presumption of innocence in a criminal case, ever present, throughout the controversy, until overcome by the most solid and substantial reasons established by plain and certain proofs. Indeed, this presumption is essential to the maintenance of society, for without it, man would be denaturalized, the ties of family broken, the instincts of humanity stifled, and one of the strongest incentives to the propagation and continuance of the human race destroyed.

Unquestionably when the power of the court is invoked to place an infant into the custody of its parents and to withdraw such child from other persons, the court will scrutinize all the circumstances and ascertain "if a change of custody would be disadvantageous to the infant." If so, the change will not be made, "and it matters not whether it is through the fault or the mere misfortune of the legal guardian that the infant has come to be out of his custody."—Hochheimer's Custody of Infants, p. 29.

But mere speculation as to the probability of benefit to the child by leaving or returning it, should have but little weight, and the courts should, and will, enforce the parent's right to the custody of the child, unless it clearly appears that the welfare and interest of such child will be best subserved by denying it.

The award, in the decree of divorce, of the custody of Russell to the father, if legally effective at all, under the circumstances of this case, was necessarily temporary in its nature. In such proceedings the power to make orders touching the care and custody of minor children must be held to be limited

to the conditions and circumstances existing at the time such orders are made. The court can not then anticipate what may possibly thereafter happen, and provide for such future contingencies. Notwithstanding a divorce decree awarding the care and custody of minor children to one of the parents, upon the death of such parent, the other parent becomes entitled to the custody of such children, unless in a contest therefor it be shown that such parent is disqualified, or the interests of the children require some other disposition of their persons.—Mills' Ann. Stats., § 2090; *Schammel v. Schammel*, 105 Cal. 258, 38 Pac. 729; *In re Neff et al., supra.*

Plaintiffs in error, however, contend that the evidence establishes the unfitness and disqualification of defendant in error to have charge and control of this child. They assert that the decree of divorce, in favor of the father, and against the mother, solemnly adjudged her guilty of acts that show her unfitted for the custody of Russell; that the testimony of one Mills, who was also a witness in the divorce suit, brought before the trial court the particular acts upon which the divorce decree was based; that Mills' testimony is corroborated by a letter written to defendant in error by one Britton just after the mother fled to Europe with Russell, and also by a letter written by defendant in error to plaintiff in error George R. Wilson from St. Gallen, Switzerland, when overtaken by her husband.

The trial court held that the decree of divorce was admissible in evidence for the sole purpose of showing that the parties were, in fact, divorced, but could not be considered as proof of the truth of the grounds for the decree. In this we think the court was right. Mutuality is essential in the application of the rule of *res adjudicata*. A party will not be concluded by a former judgment, unless he could

have used it to his advantage and to the disadvantage of the other litigant, had the judgment been the other way. Both the litigants must be alike concluded or the proceedings can not be set up as conclusive upon either. Greenleaf on Evidence, § 524. Had the decree in the divorce suit been in favor of the wife, plaintiffs in error would not, and could not, have been estopped by it. Unquestionably, matters determined in a divorce suit are conclusive between the parties thereto, and as between such parties a decree fixing the custody of children within the jurisdiction of the court is *res adjudicata* until modified or annulled in some appropriate proceeding, but the death of Francis rendered that portion of the decree in question, fixing the custody of Russell, inoperative. Plaintiffs in error say that they do not contend that the divorce decree is conclusive of the proof of the facts upon which it is based, but that it is evidence to be considered by the court; that the circumstances under which is was rendered amount to an admission of the truth of the charges. We do not think that such significance can be deduced from the decree, and the circumstances under which it was entered. The defendant in that suit therein denied the charges alleged, and, while she made no effort to controvert or disprove them at the time of the trial, she was hardly in a position to do so. She testified that she never knew what the exact charges, made against her in the divorce suit, were, until during the trial of the suit for the possession of her son.

Moreover, long after the divorce decree was granted, it appears that one Woods, a witness therein, who testified in the divorce suit, as did Mills, to support the charges therein, made a dying confession to the effect, that in the presence of the witness Mills, a plot was entered into to obtain a decree, by perjured testimony, in favor of Francis in the divorce

case. We think defendant in error should have undertaken in that case an investigation of the facts in her own behalf, and, as was said by the lower court, ''is to be criticized for not defending more vigorously her rights to the custody of the child in the divorce proceedings.'' But it is not what might have been, or what should have been, but what was, and is, with which we are concerned.

The Britton letter was in no wise admissible in evidence for any purpose whatever. Witness Mills testified that he received it from Francis, but as to how it came into the possession of the latter, is not disclosed. It is certain that it was never received by, nor has it ever been in the possession of, defendant in error. The letter written by June to George R. Wilson from St. Gallen is sought to be impressed with the character of a confession of the wrongdoing subsequently set forth in the divorce proceeding. We are of the opinion that the letter is capable of a far more innocent construction, and, under the circumstances of this case, such meaning can not be justly ascribed to it. The witness Mills testified that in June, 1903, he related to George R. Wilson all of the alleged facts concerning June's wrongdoing, and George R. Wilson testified that when he talked with June in New York, after her return from Europe with Russell, and after the receipt of the letter in question, she asked him to forgive her for taking the child away and that he did so, and nothing else was discussed between them; that the running away with the child was all that the letter written from St. Gallen referred to, and that his only purpose in preserving that letter was as a protection against further effort upon the part of the mother to take the child.

Subjecting Mills' testimony to the test of probability, but few of the elements entitling it to belief, remain. He admitted that he was employed by the

man Britton as private secretary; that his duties consisted principally in doing his "messenger business," and acting the part of "procurer"; that he falsely assumed the role of "Charles Huntley, Private Secretary to Francis Wilson," in corresponding with Woods to secure him as a witness in the divorce suit; that he accompanied Francis Wilson to Europe and assisted him, without compensation, in his chase after defendant in error and her child; that he, in other ways, busied himself in behalf of Francis Wilson in procuring the divorce, and, finally, came from New York and appeared and testified in the case at bar in answer to a newspaper advertisement, without promise of compensation, but in hope of reward, for the sole purpose of giving testimony which, if true, any man with decency, respectability, manhood, or honor would have refrained from reciting, except in obedience to the law's imperative demand. Moreover, the testimony of this witness is flatly contradicted by defendant in error, is in no wise corroborated, and is wholly insufficient, under the circumstances, to establish any wrongdoing on the part of the mother of this child.

But, were we to assume the truth of the charges in the divorce proceeding, and testified to herein by witness Mills, that would not, of itself, constitute a present disqualification of defendant in error as the proper custodian of her child. The matters therein, and thereby, charged, are said to have taken place in 1902 and 1903. There is not the slightest intimation or suspicion of subsequent wrongdoing. On the contrary, the evidence clearly shows, that in point of respectability and morals, at the present time, no objections can be urged. We can not assume that, because objections did exist, or were charged against her at that remote period, they still exist, when the evidence shows that she is now happily married, is

the mother of another child, has a good home, dear friends, an enviable social standing, and a reputation for charitable work that has earned, and received, the commendation of those high in authority. We are fortified in this view by the voice of Francis, declaring to the mother of this child, "that after seeing you to-day in your surroundings, I feel that you are the proper one to have him in charge. * * * I wish to try and atone for some of the wrong I have done you." Here is the father, to whose custody Russell had been given by a judicial decree, solemnly declaring the defendant in error to be the proper person to have Russell, to "educate in a refined atmosphere."

Either Francis was, at that time, absolutely and irretrievably lost to every sense of honor, right, decency, and manhood, or he knew and felt in his own consciousness that the mother in her then surroundings, was a fit and proper person to have the care and custody of their child, and that whatever wrongs had previously existed were not wholly hers. The evidence discloses that Francis requested his mother to take Russell to Europe; that he also testified in a bankruptcy proceeding, that he had fully repaid the money advanced him by June for that purpose. This evidence is not controverted. We are justified, therefore, in assuming that Francis secured the money in good faith, to have Russell sent to England, and, failing in his purpose, returned the money. We are persuaded that the hearts of these plaintiffs in error will be gladdened by the mantle of charity which we thus place over the acts of their dead son, and by the memory of their love for him, acquiesce in his judgment, and ours, that Russell's mother is a fit and proper person to have his care and custody.

Counsel, however, contend that defendant in error voluntarily committed Russell to the care of

plaintiffs in error, and has permitted him to so remain until his affections have become centered in them, as well as theirs in him, and that, therefore, this is one of those exceptional cases where it is clear the welfare of the child demands that its custody be not changed. The great love and affection which the grandparents have for this child, and the care they have bestowed upon it, is clearly evident and must necessarily be considered; but the sorrow that must come to them, when deprived of its custody, is not a sufficient reason to justify a court in denying the right which naturally belongs to a parent, much as that sorrow must appeal to every sympathetic mind; nor is it a sufficient reason that the child has learned to love another. In the heart of every child there is usually love and affection for all, and the feeling of attachment to those with whom Russell has most recently been associated will soon yield to that affection, regard and love which none but a mother can feel and manifest toward her own offspring.

In the case of *Chapsky v. Wood*, 26 Kan. 650, cited by counsel for plaintiffs in error, a little girl was taken at birth by her aunt, who had thereafter always cared for the child and performed towards it the duties of a mother. The mother was too ill to care for the child, and the father was too shiftless to care for either. When the child was five and one-half years of age, and the mother was dead, the father sought the court to take the child from the loving care of the aunt—the foster mother—and deliver her into the custody of the father, then residing in the home of his parents. This the court, and, in our judgment very properly, refused to do. In that case, the father, through shiftlessness and coldness of disposition, failed to manifest any affection for his offspring until it pleased him to seek its custody. He had, in effect, abandoned it, and the rule applied

there is similar to *McKercher v. Green, supra,* where the child was not born until after the separation of father and mother, and the parent invoking the power of the court had never seen the child until about the time he sought its custody, when it was almost four years old. In the case at bar the mother had the sole care of Russell for, at least, the first two years of his life, and only gave him up when the one whose duty it was to provide sustenance, refused longer to do so, and when the health of the child required a change of climate; that she thereafter contributed to his support, and during all the time remained constant in her love. Her affection for, and interest in, her child was continuously manifested. Fearing that it was losing its affection for her, and that the grandmother was planning to permanently keep it, the mother abducted the child and fled to Europe; it was only surrendered when the mother was frantic with fright, when her funds were exhausted, and her health broken, and then only under pressure from her husband. In 1904 she pleaded with the father to bring the child to her. Again in 1905 she borrowed money and sent it to the father under the promise and the hope that she might repossess her son; and in 1906, undismayed by frequent disappointments, she crossed the ocean, and the western continent, that she might be with, and near, her boy. She was constantly writing of, and sending small presents to, him, and the letters of Linda Wilson, covering a period of seven years, show that the writer believed the mother to be deeply interested in the slightest detail in the life of the child. The evidence clearly establishes that defendant in error has a strong, deep and abiding love and affection for her child, that he has always, up to the institution of this suit, manifested a like love and affection for her. Notwithstanding

plaintiffs in error are people of good character, able and willing to properly support and educate this child, intend to make him their heir equally with their own son, and have for him great love and affection, which he reciprocates, and that his preference is to stay with them, these matters are insufficient, under the evidence and circumstances of this case, to overcome the presumption that his welfare and interests would be best subserved in the care and custody of his own mother.

As said in *Cormack v. Marshall*, 122 Ill. App. 208, 216: "The mere fact that some other person may have more money or property in any form, is not one that appeals to us. The divine injunction to multiply and replenish the species was not confined to the rich, nor was it intended that the poor should beget the children and the rich should rear them."

Mr. Mitchell, the present husband of defendant in error, was present at the trial and gave his testimony, from which it appears that, from hearing his wife talk of Russell, and observing her affection for the boy, his own love of his wife had engendered in him a feeling of parental regard for Russell, and that he would welcome the boy into his own home as his own offspring. We requested Mr. Mitchell to appear before us, and personally questioned him concerning these matters. He appears to be a man of education, refinement and more than ordinary business ability. He not only testified, and was supported by other testimony, but also assured us that if the custody of Russell was given to the mother, he had the financial ability to carry out the plans and desires of both himself and the mother; would give the boy every educational advantage, start him in business of his own selection, and would treat him in all respects as his own child. Moreover, plaintiffs in error are

well past middle life, are now in their declining years, have no young children in their family; whereas, defendant in error, by her second marriage, has become the mother of another child—a girl. The refining and ennobling influence of a happy home where young children are growing together to manhood and womanhood is generally recognized and conceded. It is under such influences that traits of manly and womanly character are first manifested and best developed.

Plaintiffs in error assert, that where other things are equal, this court should "choose to make of an American-born boy, an American citizen rather than a British subject," and, "that he be educated as an American and not as an Englishman." Permitting him to be taken to England will not necessarily change his citizenship. He is American born, and must remain an American citizen until he reaches an age of maturity, and determines for himself that he shall make a change of his allegiance, or, at least, until such change occurs by some procedure recognized by the courts. If this child were to be taken to some country governed by a despot, or where liberty, under the law, was not an inalienable right of a citizen, or where there were no educational advantages, or where its education would be contrary to Anglo-Saxon traditions, the objections to expatriation would require grave and serious consideration, and might be insurmountable. But we take judicial notice of the fact that the Kingdom of Great Britain is a government of liberty and law, and its people accustomed to receive educational and social advantages equal to those obtainable in the United States. Upon this feature of the case we will adopt the language of the late Mr. Justice Brewer of the Supreme Court of the United States, when as a member of the

Supreme Court of Kansas, he said, *In re Bullen*, 28 Kan. 781, 786:

"I cannot agree with counsel, that it is never the province of the court to expatriate a citizen. In some cases I think the duty so to do is clear and absolute. As, for instance, where parents moving to a foreign country and leaving their little child here for a while, come back to claim it, and are hindered by those who have it in possession. Nevertheless, it is a matter always to be considered. With pardonable partiality, we look upon our own land, its laws, institutions and social life, as the best; and not lightly should a child be deprived of the benefit of them. Yet we may not ignore the fact that the mother country is a land of liberty and law, of education and social refinement, of morality and religion; and it would be wrong to make the matter of expatriation an excuse for depriving this little girl of that which would promote her welfare."

It is urged that as the trial court found that Russell's preference was to stay with his grandparents, and observed a "marked aversion to his mother, as shown by his manner in the court room," which was confirmed by a personal interview with the child, we should recognize that preference, and let the child remain where it is. There are many cases reported where the court, in the exercise of its authority, has accepted the wish of the infant as to its custody. It is certain that if the child be of an age and capacity to form a rational judgment, its wish and choice should be consulted and given weight; but, as was well said by a distinguished judge: "It seems to be but a mockery to ask a child of nine years of age whether it should remain with the person who brought it up, or go with a stranger." In considering the aversion to his mother, it must be remembered that, prior to this

contest, there was no aversion, but the tenderest love and affection. We concur in the opinion of the trial court that, the explanation that the aversion is the result of certain measures taken by the mother to ascertain, and know, the whereabouts of the child, is far from satisfactory, and that the bitterness aroused by this contest has been, to some extent, instilled in the child, and that if plaintiffs in error retain possession of him, the estrangement will be still further increased. Under such circumstances, it is of prime importance to protect, as far as possible, the welfare and happiness of this child of tender years from the effects of the loss of respect and affection for his mother.

We recognize that, in giving up Russell, these grandparents will suffer keen disappointment and sorrow; but in this case, if the instincts of filial and paternal affection are of any value, or, if the voice of nature, that makes the parent the natural guardian of his child, that caused Rachel to weep for her first-born and refuse to be comforted, is worth anything, they furnish the only proper solution of this question. In the calm and peaceful solitude that must come to the hearts of these grandparents when Russell is gone, let them remember the love and affection they had for their own son, and realize that as they would have had it done for them, in a contest for their son, we now do for the mother of this child—give unto her her own.

The judgment is, therefore, affirmed.

*Affirmed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY concur.

Decided July 6, A. D. 1910; rehearing denied October 11, A. D. 1910.