No. 11,849.

SAUM v. FREIBERG.

Decided October 10, 1927.

On petition for custody of minor children. Decree for petitioner.

*Reversed.*

1.  CHILDREN—*Custody—Evidence.* As to the character and quantum of evidence necessary to overcome the presumption that parents are entitled to the care, custody and control of their children, see Wilson v. Mitchell, 48 Colo. 454.

2.      *Custody—Testimony.* Testimony of children, based largely on hearsay, as to their father's delinquencies, in a proceeding to determine their custody, held incompetent and its admission so prejudicial to the rights of the father as to constitute reversible error.

*Error to the Juvenile Court of the City and County of Denver, Hon. Ben B. Lindsey, Judge.*

Mr. JOEL E. STONE for plaintiff in error.

No appearance for defendant in error.

*Department One.*

Mr. Justice Sheafor delivered the opinion of the court.

On January 4, 1927, the defendant in error, Annie Freiberg, filed a petition in the juvenile court of Denver, in which she set forth, in substance, that Margaret Saum, age 14 years, Rita Saum, age 12 years, and Eleanor Saum, age 9 years, were dependent children for the following reasons:

That their "environment is such, or about whose custody a controversy is such as to warrant the state in the interest of the children in assuming or determining their guardianship, or in determining what may be for the best interests of said children.

"That the mother of said minor children is deceased and that the father of said children is not a fit and proper person to have the custody, care and control of said children because of his immoral conduct with other women."

Defendant in error is the maternal grandmother of the said minor children. On March 14, 1927, the case came on for hearing before a jury, both the petitioner and the respondent being represented by counsel. The jury returned a verdict finding that it would be for the best interests of the children that they be left in the custody of the petitioner. Upon this verdict the court rendered judgment that the children be given into the custody of petitioner until the further order of the court, with permission to the father to visit them at reasonable times. The respondent brings the case here for review.

It appears that sometime in November, 1926, the mother of the children filed a petition in the juvenile court, asking that they be declared dependent, but before the petition could be heard, and about December 1, 1926, she died. At the time the mother's petition was filed, she and respondent were living separate and apart, and a divorce action, brought by him, was pending.

Many errors have been assigned on the admission of evidence, and these we will now consider. Margaret Saum was called as a witness for petitioner and was

asked: "Q. State whether or not you know of your own knowledge that your father is immoral? A. He is. Q. Tell the jury then what you know about his morality or immorality? A. Ever since he married mama, he has been running around with women."

The witness then testified that she and her mama had tracked and traced him. She said: "We followed him around. When I went to school over at St. Catherine's, there was a phone call came to me, this woman had been trying to get me all day."

The witness was permitted to relate the telephone conversation between herself and the woman who called her. The phone conversation was to the effect that the woman told witness that she had heard that her father was sick and wanted to know how he was; that witness would not tell her unless she gave her name. The woman finally said that she was Mrs. Leman, of Green Brothers; that if witness would be home in half an hour she would send her over something. This evidence was objected to, which was overruled, and a motion to strike it out was denied. The court, however, explained to the jury that: "Unless this testimony, as given by this little girl is in some way connected with some other testimony that shows directly of itself that the father had some connection with this woman, or the woman with the man, her father, the mere conversations of this little girl over the telephone with this woman cannot be used by you as evidence against her father. I am going to allow it to go in with that explanation."

Then the witness was asked: "Q. Now, did you have any conversation with your mother on her deathbed, just before she died? A. Yes, sir. Q. What, if any, conversation did you have with her? Relate it to the jury."

The answer was: "Mama told me, she says, Margaret don't go with that man, if you can possibly help it. She says, the way he has treated me, and the way he will treat you, and the way he has threatened you, not to go with him if you can possibly help it."

A motion to strike out the answer was denied. The witness testified that she had a conversation with her mother about a week before she died while her mother was in bed and very ill. She was then asked: "Q. Do you know whether or not she believed she was going to die? A. I believe she did.

"The Court: Do you know she believed she was going to die? Answer yes or no. * * * A. She did believe she was going to die.

"Q. You had this conversation alone with her? A. Yes, sir.

"Q. Just tell the jury what she said. * * * About her disease and sickness and condition that caused it. A. Margaret, you know your father knocked me down and gave me this blood poison. She says, when I am out of the way, please if you can, stay with your grandmother. I would rather know you are with her, where I know you are getting moral care; you have good surroundings."

A motion to strike this testimony was denied. The witness was then permitted to testify that her grandmother had paid her mother's bills and had loaned money to respondent; that she had paid grocery bills, and that her grandmother had always told her to love and respect her father; and she also testified concerning the teachings given her by her grandmother with reference to morals. The witness was then asked: "Q. Did he (her father) love you three children, you and Rita and the little girl? A. No, he did not love us. He says he loved mama; if he would leave mama, naturally he would have no care for us and no love for us, when he would pick up and leave."

Rita Saum, called as a witness on behalf of petitioner, testified: "Q. Now, Rita, who do you want to live with? A. My grandmother.

"Q. Why do you want to live with your grandmother? A. Because she has cared for me ever since my birth, and she can care for me until I am able to care for myself.

"Q. Why don't you want to live with your father? A. Well, he has been going around with women, and that is not the right bringing up for children."

The character and quantum of evidence necessary to overcome the presumption that parents are entitled to the care, custody and control of their children, are fully and clearly set forth in *Wilson v. Mitchell*, 48 Colo. 454, 111 Pac. 21, 30 L. R. A. (N. S.) 507, and need not be restated here.

It needs neither argument nor the citation of authorities to show that much, if not all, of the evidence above quoted was incompetent and its admission very prejudicial to respondent.

Because of the admission of this evidence, the case must be reversed. We need not pass upon the other assigned errors as they may not arise again upon another trial.

The case will be reversed and remanded with instructions to grant respondent a new trial.

MR. JUSTICE DENISON, sitting for MR. CHIEF JUSTICE BURKE, MR. JUSTICE WHITFORD and MR. JUSTICE CAMPBELL concur.