**ZERLICK, Neglected Children, In re.**

Juvenile Court, Cuyahoga County.

No. 151781.   Decided March 28, 1955.

Frank T. Cullitan, Pros. Atty., Sheldon D. Clark, Edward Goette, Cleveland, for the County Welfare Department.

Philip Kasdan, Cleveland, for the mother of minors.
Charles A. Vanik, Cleveland, for the foster parents of the minors.

## OPINION

By WOLDMAN, J:

This matter came on to be heard on applications filed by the Cuyahoga County Welfare Department, Division of Child Welfare, for permanent custody of Florence Sullivan, Thomas Zerick and Lawrence Sullivan, minors 4, 9, and 6 years of age, respectively, for the purpose of having said minors placed for adoption.

Lawrence Sullivan, Sr., father of Lawrence, Jr., and of Florence Sullivan, has heretofore agreed in writing to relinquish his rights as a parent and has consented to the Cuyahoga County Child Welfare Board receiving permanent custody of said Lawrence, Jr., and Florence Sullivan, and has given his written consent to the adoption of his said two minor children.

Caroline Zerick, aka Caroline Sullivan, aka Caroline Kraft, the mother of Thomas Zerick and Lawrence and Florence Sullivan, opposes the granting of the motion and is requesting that the custody of the three children be returned to her.

Mr. Sullivan is not the father of Thomas Zerick. Thomas was six months old when Mr. and Mrs. Sullivan married. Mr. and Mrs. Sullivan have been divorced since June 25th, 1951.

The Sullivans have another child, Ellen Marie Sullivan, born January 5th, 1947. This child is not involved in this action. Another child, Rose Mary Kraft, was born to Mrs. Sullivan (who now goes by the name of Mrs. Kraft) on October 4th, 1951, the father of this child being Mr. Kraft, whom Mrs. Sullivan claims to be her common-law husband. This child, too, is not involved in this action.

The marital history of the Sullivans is an unbroken series of difficulties, separations, reunions and separations again. The father accused the mother of neglect, drinking and immorality. In June 1950 the father deserted the family and after his return in October 1950 the mother deserted the children. She returned on November 1st, 1950, and deserted them again on November 22nd, 1950.

On December 21st, 1950, this Court adjudged the minors, Thomas, Lawrence and Florence to be neglected children and committed them to the temporary care and custody of the Cuyahoga County Child Welfare Board. On March 9th, 1951, the mother, Caroline Sullivan, pled guilty to a charge of contributing to the neglect of her children and was given a one year sentence in the Ohio Reformatory for Women in Marysville, Ohio. This sentence was suspended on condition that she conduct herself properly and care for the children.

In April 1952, Mr. Kraft, father of Mrs. Sullivan's new baby, Rose

Mary, was convicted and sentenced to the Ohio State Penitentiary for auto theft, and Mr. Sullivan and his ex-wife planned remarriage for the purpose of giving all the children a home. However, the plans for remarriage did not materialize. On January 25, 1952, and again on June 1st, 1953, Mr. Sullivan signed agreements to relinquish his parental rights to Florence and consented to her adoption, and on November 8th, 1954, he signed an agreement to relinquish his parental rights to Lawrence and consented to his adoption.

On January 2nd, 1953, Mrs. Sullivan advised the Cuyahoga County Child Welfare Board in writing:

"It is my wish that the Cuyahoga County Child Welfare Board have permanent custody of my child, Florence Sullivan, at the time that it is learned that she is placeable for adoption."

Mrs. Sullivan signed this consent as "Carolyne Frances Kraft."

In June 1953 Mrs. Kraft left her child, Rose Mary, at her landlady's home and disappeared, reportedly going to Columbus with another man, getting him drunk and stealing his automobile. She was arrested four months later and sentenced to the Federal Reformatory for Women at Alderson, West Virginia. She was committed to that institution on January 11th, 1954, to serve a term of one year and one day for interstate transportation. Her full term expired on December 29th, 1954, when she was released on parole.

Mrs. Sullivan testified in the present proceedings that she intends to return to Mr. Kraft, her common-law husband, after his release from prison some time in 1955. According to the records, the offense for which he is now serving is his fourth criminal offense.

The minor, Thomas Zerick, who was six months old when his mother married Mr. Sullivan, has a history of neglect and abuse by his parents. He was three and a half years old when his parents separated and subsequently he was placed in the home of a Harry and Pauline Egler where he has become a happy and well-adjusted child. The Eglers now desire to adopt Thomas.

Lawrence was 17 months old when he was deserted by his mother. He has been in foster home placement with the Eglers since April 6th, 1951. Having been abandoned by his mother when he was only 17 months old, he naturally does not remember her. The Eglers desire to adopt him also.

Florence, born July 14th, 1950, has been in foster home placement with Edwin A. and Clara M. Summers since March 26th, 1951 (when she was eight and a half months old). The evidence reveals that Florence is very happy and well adjusted in the Summers home and knows no other parents. They desire to adopt her.

The maternal grandparents have offered to assist Mrs. Sullivan in supporting the children should they be returned to her. But the grandparents, themselves, have had a stormy marital life with a history of alcoholism and abusive behavior on the part of the grandfather Other relatives of Mrs. Sullivan have also offered to help but they have no legal responsibility to continue such help and support.

\*           \*           \*           \*           \*

Before the adoption proceedings contemplated by the Eglers and Summers can be effectuated, it is necessary to terminate the parental rights of the mother, Mrs. Sullivan. Termination of parental rights ends for all time these rights and duties virtually with the finality and irrevocability of death.

Involved in these proceedings is one of the most intimate and cherished of human relations, namely, the parent-child relationship. This relationship was not created by law but grows out of natural law. Human lives are the subject of consideration here, for what is done regarding the permanent custody of the three children involved in these proceedings permanently affects the whole course of their lives. The state should not interfere with the rights of parents with respect to their children and assume jurisdiction over such children on the generalized assumption that they are in need of the care and protection of the state merely because it disagrees with the parents as to the best course to pursue in rearing the children. Nor should it be authorized to take children from their parents merely because in the estimation of the court the children can be better provided for and more wisely trained as wards of the state.

A child is not property to be given away. The state may not abrogate the parents' natural right to the custody and society of the child except when the interest of society requires it. The rights of parents to care for their children and to exercise their discretion in meeting the needs of their children are basic to our society. As is said in **In re Hock, 55 Abs 74:**

"The natural parents of any child have a predominant right to its custody and care, which can only be abrogated when it clearly appears that they have forfeited that right by conduct which will impair the present and future welfare of their child.

"The sacred tie which exists between parents and children should not be severed or terminated unless the evidence produced at the hearing clearly shows that any fault of the parents occurring in the past is at the time of the hearing of such charge, effective to render such parents unfit and unsuitable to have the care and custody of such child, and that they are then at such time, by reason of such fault, incapable of extending to such child proper parental care."

There are situations in which society has the obligation to act in an individual case for the protection of the child and society. The state possesses supreme power over the welfare of its children and has the power to limit the parents' rights in order to see to it that the child receives the care, protection or help he needs. In taking action in such a case the state must insure that both the child's and the parents' rights are protected and that, if they must be limited, they are limited only in accordance with due process of law and only to the minimum extent and for the minimum period necessary to accomplish the objective sought.

Even where the state compels the parental surrender of a child because of unfavorable circumstances clearly detrimental to the welfare of the child, it will not order permanent surrender of the parental rights

and duties if effective control over the child can be established through the awarding of temporary guardianship and legal custody without ending for all time these final rights and duties. Ordinarily a parent though declared unfit will be permitted to reclaim the child when the circumstances change for the better. Any other policy would be harsh and cruel to the parent, a denial to the child of its natural birthright and contrary to public policy.

As stated in the case of In re Konneker, 30 Oh Ap 502, at page 510:

"Parents have a right to the custody of their children, the same as they have a right to the possession of property which they may acquire; and the fact that some one may think that the children can be reared better by some one else is no justification for judicial interference, because, if this were the rule, there are thousands of children in this community, and in every other, whose parents upon this pretense would be deprived of their custody. As was well said by another:

" 'The Juvenile Court Law certainly does not contemplate the taking of children from their parents and breaking up family ties merely because, in the estimation of probation officers and courts, the children can be better provided for and more wisely trained as wards of the state. Probably from mere considerations of healthful and hygienic living and systemic education and training this would be true in the cases of thousands of families of wealth and respectability. We think it is only in instances where there is demonstrated incapacity or something akin to criminal neglect that the law is justified in interfering with the natural relations of parent and child.' People v. Gutierrez, 47 Cal. App., 128, 190 P., 200."

But it is well-settled authority that the parents' right to the custody of the child is not absolute under any and all circumstances. A parent ". . . may relinquish it by contract, forfeit it by abandonment, or lose it by being in a condition of total inability to afford his minor children necessary care and support." Clark v. Bayer, 32 Oh St 299.

This ruling was approved and followed by the Supreme Court of Ohio as late as June 9, 1954, when in the case of In re Tilton, 161 Oh St 571, 53 O. O. 427, the court held:

"It has long been the law of this state that the right of custody of a child may be forfeited through abandonment. Such was the decision of this court in Clark v. Bayer, Supra. We do not believe that the law in that respect has changed by present statutory provisions."

In the present case the mother, Mrs. Sullivan, is pressing her natural claim to the custody of her children. She impresses the Court as being sincere in her desire to make amends for her derelictions' and shortcomings as a mother and the abandonments and criminal neglect of the past. However, there is nothing in her past record to convince the Court that she possesses the ability or strength to refrain from returning to her former standard of conduct. Nor do her present and future prospects promise anything better, as she has indicated to the Court that she will return to her so-called common-law husband after his release from prison and that she would in all probability take her children to live with her in whatever home he might establish. The

children hardly know her, and, through her neglect and abandonments of the past and her infrequent visits with them, she is hardly in a position to know them. The children appear to be happy and well adjusted with their present foster parents who desire to adopt them.

In controversies affecting the custody of a minor child, the interest and welfare of the child is the primary and controlling question by which the court must be guided and will prevail over any mere preponderance of legal right.

"In cases to determine the custody of minor children various interests are involved, those of the parent, of the person to whom the custody of the child is entrusted, of the state, and of the child. Of these, the most important and controlling is that of the child, for, by a proper decision as to that, the other interests are best subserved." Wilson v. Mitchel, 48 Colo., 454, 111 Pac. 21, 30 LRA (n. s.) 507, Am Jur. Vol. 39, P. 607.

Because the Court feels that the children's return to their mother and maternal relatives would not serve the best interests of the children, the mother's request for the return of her children is denied, and the motion of the Division of Child Welfare of the Cuyahoga County Welfare Department for permanent custody is granted.