152 Oh St 423, 40 O. O. 423, 89 N. E. (2d), 645. We are of the opinion that the District Judge was not in error in directing a verdict for the appellee. See **Reed v. Erie R. Co.**, 134 Oh St 31, 35, 11 O. O. 411, 413, 15 N. E. (2d), 637; **Canterbury v. Pennsylvania R. Co.**, 158 Oh St 68, 76, 48 O. O. 34, 37, 107 N. E. (2d), 115.

The judgment is affirmed.

### DOUGLAS, In re.

Juvenile Court, Huron County.

No. 2987. Filed November 21, 1959.

Miller, Miller & Miller, Norwalk, for Charles Ray Douglas.
Clifford F. Brown, Norwalk, for Carol Douglas.

## OPINION

By YOUNG, Jr., Judge.

ALLEGED DEPENDENT AND NEGLECTED CHILDREN

This matter first came to the attention of this court late in January. 1959, when Carol Douglas, the mother of the children involved, came to the court and complained of her husband's conduct toward her. At that time she and her husband had been residents of this County for only a very short time. She was advised that her domestic problems should be brought into the Common Pleas Court in the county she came from, and that she should seek the advice of an attorney.

Some time thereafter, Charles Ray Douglas, the father of the children, came to this court complaining that his wife would not obey him, but had taken employment contrary to his wishes, and was neglecting the children. He also was told that he should see his attorney about the problem.

These two preliminary matters do not appear in the records of this matter, as the record commences with the official proceedings on April 16. However, they are part of the unofficial or informal proceedings of this court in this matter, and as such will be judicially noted by the court.

At this point it should be noted that the Ohio statutes, §§2151.18 and 2151.35 R. C., recognize both formal (or official) and informal (or unofficial) proceedings in the juvenile court in cases involving children. While the statutes do not define the mechanism of informal procedure, over the more than fifty years that there have been juvenile court laws in this state a well-defined informal procedure has been developed. It is distinguished from the formal procedure by the fact that no written pleadings are filed and the case is not docketed or recorded, but memoranda are made and kept in the social files of the court, which under the provisions of §2151.14 R. C., are confidential. On page 4 of the recently published "Juvenile Court Statistics for 1958," the difference between official and unofficial proceedings in the juvenile court is defined as follows:

"OFFICIAL CASE: An official case is one which comes to the attention of the court through the filing of a written complaint which is not withdrawn before action is taken by the court on such complaint.

"UNOFFICIAL CASE: An unofficial case is one not included in the definition of an official case above."

On page 6 of the same publication, Table B shows that in 1958 in all of the Juvenile Courts of Ohio there were 28,905 delinquency cases disposed of, 11,105 of which were official cases, and 17,800 were unofficial.

On the evening of April 15, 1959, the mother of the children called the police of Monroeville and complained that the father of the children had driven her out of her home and had taken the children, who were ill, and gone away with them. The police called and reported the complaint to the judge of this court. A juvenile probation officer, Mrs. Miller, accompanied by a police officer, was sent to locate the children and take them into custody. She found them at the home of the father's parents, and took them to the Fisher-Titus Memorial Hospital, where

they were examined by Dr. John Blackwood and admitted to the hospital. Mrs. Miller testified that she found the children ill and dirty, the younger one having a woman's underslip on for a diaper. Dr. Blackwood testified that the children were very dirty, when he examined them, and both were suffering from an upper respiratory infection. He also found that the younger child was anemic, and the older had some iron deficiency, although the blood chemistry was within normal limits. He attributed the anemia to nutritional deficiency.

The following morning a formal complaint was filed in this court alleging that the children, Christine Jodione Douglas, age two years and Cynthia Rae Douglas, age one year, were dependent and neglected children, in that they lack proper care because of the faults or habits of their parents and their condition or environment is such as to warrant the state in the interest of said children in assuming their guardianship. An order was entered on the Journal of the Court reciting that it appearing that the children were in such condition that their welfare required that their custody be immediately assumed by the Court, it was ordered that citations be issued requiring the parents to appear personally before the Court on the 23rd day of April, 1959, at 10:00 a. m., and that it be endorsed upon the citations that the officer serving the same shall take the children into custody at once, and that the children be temporarily placed in the Fisher-Titus Hospital to be brought before the court at the time stated. Later in the day, the court was advised by Dr. Blackwood that the children were sufficiently recovered to be discharged from the hospital. Thereupon, another order was entered upon the journal of the Court placing the children temporarily in the custody of their mother, Carol Douglas, until the time of hearing. The citations were returned by the Sheriff on April 20, showing personal service on the mother, Carol Douglas, and residence service on the father, Charles Ray Douglas.

At the time set for hearing, both parents appeared, each represented by counsel. Hearings occupied parts of several days, spread over a period of six months. Specifically, hearings were had on April 23, April 24, May 11, September 25, and October 9, 1959.

During the pendency of the proceedings, a divorce action, which had been filed in the Court of Common Pleas by Carol Douglas on April 15th, was certified to the Juvenile Court on April 18th. Papers filed with the divorce petition indicated that Mrs. Douglas had filed an action for divorce in Crawford County on January 29th, but the action was later dismissed.

Some time after the hearing on May 11, the parties to the divorce action resumed their marital relationships. This reconciliation lasted about two or three weeks. On July 23, 1959, Charles Ray Douglas filed another action for divorce in the Court of Common Pleas. This was also, on October 8, 1959, certified to the Juvenile Court, and is presently pending therein.

A large number of witnesses testified in this case, and from the testimony a most unpleasant picture emerges. Mr. Douglas was born January 19, 1924. Mrs. Douglas was born March 1, 1940. They were

married May 5, 1956. Christine, the older child was born January 30, 1957, and Cynthia was born March 13, 1958. Thus at the time of the marriage, Mrs. Douglas was sixteen years old, and her husband was thirty-two years old.

"Husband twice as old as wife, argues ill for married life," W. S. Gilbert.

The testimony shows that during the time he was courting the present Mrs. Douglas, Mr. Douglas, who had been previously married and divorced, was carrying on an adulterous relationship with his former wife. Some time after the marriage, when Mrs. Douglas asked him about this affair, Mr. Douglas said that he had spent a week with his former wife while her husband was on a fishing trip; that he had done this to prove to her husband that he could get her back if he wanted her.

Mr. Douglas became acquainted with Mrs. Douglas through one of her brothers whom he had impressed with his fancy automobile. Mrs. Douglas's mother tried to discourage the courtship, but although she ordered Douglas to stay away, he refused to do so. Finally, he and Mrs. Douglas ran away to Indiana and stayed over night. He then asked the mother's consent to marriage. Mr. Douglas's mother also came and asked her not to prosecute him for running away with the girl, so she finally consented to the marriage, which took place in Indiana. It needs no citation of authority to show that Mr. Douglas could have been charged with and convicted of a violation of §2151.41 R. C., as a result of this conduct on his part, which clearly constituted acting in a way tending to cause the delinquency of the child, Carol Douglas. Her conduct, both before and after marriage, constituted delinquency. **State v. Gans, 168 Oh St 175, at pages 179 to 183.**

One witness testified that on one occasion after his marriage, Mr. Douglas had made advances to her.

Mrs. Douglas testified that for sometime prior to their divorce actions Mr. Douglas had been unemployed. He had lost his job because his wages had been garnisheed by the Federal Government as the result of some income tax difficulty. She stated that whenever they would quarrel, Mr. Douglas would take the children and run off with them; that he threatened her that if she contested his divorce action, she would never get to see the children. On one occasion, he told her that he was anxious for the children to grow up, so he could tell them what a whore their mother was. There was other evidence of improper conduct on the part of Mr. Douglas.

As already pointed out, Mrs. Douglas was an undisciplined child who ran off with a man twice her age to force her parents consent to marriage.

Mrs. Douglas, according to testimony, has two brothers who have served time in the Mansfield Reformatory for such offenses as breaking and entering, statutory rape, and forgery. One of them was returned to one Reformatory for parole violation because he operated Mr. Douglas' car without permission.

During the pendency of this matter, after one quarrel with her husband, Mrs. Douglas ran off with a young man named Sammy Lemon, and

spent one or two nights out at the Norwalk reservoir with him. There was also evidence of other improper conduct on her part.

It should be recalled that this court had the dubious privilege of seeing and hearing the witnesses who testified in this matter. Some of them are well, and unpleasantly, known to the court as the result of criminal charges against them. Without going any further into the details of the testimony, it is sufficient to say that this court must necessarily conclude that both Mr. and Mrs. Douglas have been guilty of serious marital misconduct; that Mr. Douglas is a conscienceless, selfish monster, whose main interest in the children is to use them as clubs to beat his wife into submission; that Mrs. Douglas is without either morals or good sense, and is also more concerned with gratifying her desires of the moment than the welfare of her children.

In this state of facts, what is the law? **Sec. 2151.03 R. C.,** in part defines a neglected child as follows:

"As used in §§2151.01 to 2151.54 inclusive, **R. C.,** 'neglected child' includes any child:

"(B) Who lacks proper parental care because of the faults or habits of his parents, * * *;

"(C) Whose parents * * * neglects or refuses to provide him with * * * other care necessary for his health, morals, or well-being;

"(D) Who * * * associates with vagrant, vicious, criminal, notorious, or immoral persons; * * *."

**Sec. 2151.04 R. C.,** in part defines a dependent child as follows:

"As used in §§2151.01 to 2151.54 inclusive, **R. C.,** 'dependent child' includes any child:

"(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship."

The record shows clearly that these children have been kicked back and forth between their parents like a football; that at the time the court intervened, the children were sick and dirty. Perhaps, as the parties tried to convince the court, this was a temporary condition that resulted from the father's habit of climaxing his quarrels with their mother by snatching up the children and running off to his parents with them, but does that make it proper parental care? What sort of a future is ahead for them, with a father who is only waiting until they are old enough to understand so he can tell them evil things about their mother?

It is the opinion of this court that in the State of Ohio every child is entitled, as a minimum, to have two parents living together in reasonable harmony with the child and with each other. The tragic and ever-increasing procession in the juvenile court of children who lack this minimum is oppressive indeed. The record clearly shows that the children involved in this matter have not had proper, or really any, parental care since the first of this year, at least. It is clear also that such lack of proper parental care is entirely the result of the faults of the parents, which are many, and of the extremely bad habits of the parents.

It seems equally clear that parents to whom adultery is a normal

course of life, who are selfish and childish far beyond any reasonable limits, and whose ideas of proper upbringing are to tell the children how vile each other has been, are neglecting or refusing to provide them with care necessary for their morals or well-being.

There can be no doubt whatsoever that the parents, and at least some of their friends and relations are vicious, criminal, or immoral persons, and these children, young as they are, already are in almost constant close association with these vicious, criminal and immoral persons.

This court therefore has no hesitancy in finding that upon the facts disclosed by the evidence in this case, the children, Christine and Cynthia Douglas, are neglected children under the Ohio statute.

The question of whether the children are also dependent children is somewhat more difficult to resolve. The only applicable portion of the statutes defining dependent child is **paragraph C of §2151.04 R. C.,** set forth above. This portion of the statute has been in effect for many years, but the reported decisions are more concerned with narrow technical decisions of what dependency is not, than of what it is.

However, the Supreme Court, for over one hundred years, has been entirely clear and consistent in its expressions. For reasons best known to themselves, the Courts of Appeals, in considering problems arising under this statute, have rarely referred to the decisions of the Supreme Court, but have gone off on tangents of sentimental nonsense about the "sacred tie which exists between parents and children." **In re Konneker, 30 Oh Ap 502 at 510.**

The Supreme Court, with a much better grasp both of the facts of life and the fundamental and ancient legal principles which underly the juvenile court law, has held:

"Neither of the parents has any rights that can be made to conflict with the welfare of the child." **Gieshwiler v. Dodez, 4 Oh St 615.**

"While the legal rights of the parents are to be respected, the welfare of the minor is of paramount consideration." **Clark v. Bayer, 32 Oh St 299 at 305.**

These cases are cited with approval by the Supreme Court as recently as 1954, in the case of **In re Tilton, 161 Oh St 571 at 575.** It would seem from these expressions that in determining whether the condition or environment of a child is such as to warrant the state, in the interests of the child, in assuming his guardianship, the primary consideration should be the welfare of the child.

It seems quite apparent that the welfare of the children here requires something better than that they be made the instruments of the childish, spiteful, and immoral purposes of their parents. The court has examined the reported decisions of the courts of this state for some further light on the matter. Unfortunately, precedents are illuminating only to the extent that their facts are similar to the facts of the case at bar, and in this peculiarly human field, identical factual situations are almost as rare as identical fingerprints.

However, there are a few cases which seem to bear some resemblance in their facts to the present case. In the case of In re Decker, 28 N. P. (N. S.) 433, a decision by Judge Lamneck as the Juvenile Judge

of Tuscarawas County, the Court finds the child of quarrelling and corrupt parents to be dependent. The Court of Appeals of this district, in the case of **In re Antrim, 67 Oh Ap 117,** upholds a decision finding the child of divorced parents dependent. The Juvenile Court of Cuyahoga County, in an elaborate opinion styled **Zerlick, Neglected Children, In re, 74 Abs 525,** under facts which resemble in many respects the facts of the present case, holds that the welfare of the child is the controlling consideration.

Under the evidence in the present case, and the authorities cited, the court concludes that the children, Christine and Cynthia Douglas, are dependent children.

Having found the children here involved both neglected and dependent, the final question that arises is what disposition should be made of them. **Sec. 2151.35 R. C.,** provides in part as follows:

"* * * If the court finds that the child is * * * neglected or dependent, it may by order entered proceed as follows:

"(A) Place the child on probation, under supervision in its own home, in the custody of a relative, in an institution, or in a certified foster home, wherever situate, upon such terms as the court shall determine; * * *

"(B) Commit the child temporarily or permanently to the division of social administration of the department of public welfare, or to a county department of welfare which has assumed the administration of child welfare, county child welfare board, or certified organization, or to any institution, or to any agency in Ohio or in another state authorized and qualified to provide or secure the care, treatment, or placement required in the particular case; * * *."

In this county, the county department of welfare has assumed the administration of child welfare. It is the conclusion of this court that the welfare of these children requires that they be permanently committed to the Huron County Welfare Department. These children are of sufficiently tender years that if taken permanently and completely from the strife and immorality of their parents, they may lead happy and normal lives, and grow to responsible adulthood. This court cannot decide cases in a vacuum, and without reference to what experience with hundreds of cases of delinquent, neglected, and dependent children reveals. This court is now dealing with the fourth generation of some families whose cases are in its files and records. Truly, The Lord does "visit the sins of the fathers upon the children unto the third and fourth generation." It is almost certain, it is unquestionably highly probable, that if these little children are left with their families, by the time they reach adolescence, the courts will have to deal with them as delinquents; as adults they will have no better habits or morals than their parents, creating problems for the divorce court and the criminal courts. There are only remote possibilities of their growing up to be decent and honorable adults in an atmosphere of hate, lust, spite, and wickedness. Courts must deal with probabilities, not possibilities, and this court will so act.

An order will be entered in accordance with this memorandum, com-

mitting the children permanently to the Huron County Welfare Department. Exceptions will be reserved to both parents, and a supersedeas bond fixed by the order.