242 P.3d 1128 (2010)
In re the Parental Responsibilities Concerning B.J. and K.J.
Nicole Anne Glab and Jason Glab, Petitioners
v.
Ronald David Julian and Coy Lynn Summers, Respondents.
No. 10SA146.
Supreme Court of Colorado, En Banc.
November 30, 2010.
*1129 Colorado Legal Services, Jill M. Brady, Colorado Springs, CO, Attorneys for Petitioner, Ronald D. Julian.
*1130 Brandes & Associates, P.C., Leta Brandes, Niceta Bradburn, Greenwood Village, CO, Attorneys for Respondent.
Justice HOBBS delivered the Opinion of the Court.
We issued our rule to show cause, pursuant to C.A.R. 21, to determine whether the standards enunciated in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), and In re Adoption of C.A., 137 P.3d 318 (Colo.2006), apply to a trial court's consideration of any order allocating parental responsibilities to a non-parent over the objection of a fit, custodial parent.
In this allocation of parental responsibilities ("APR") case, the District Court for El Paso County ordered several daytime and two overnight stays in the home of the children's former foster parents, Nicole and Jason Glab ("the Glabs"), against the wishes of Ronald Julian, the children's biological father and sole custodian. In issuing its order, the district court did not apply the Troxel and C.A. analysis and failed to provide any reasons for interfering with Julian's fundamental right to make decisions concerning the care, custody, and control of his children.
We hold the constitutional presumption that a fit parent acts in the best interests of the child applies to all stages of an APR proceeding. The applicable standard for consideration of an order granting any parenting time to non-parents in the face of the parent's objection includes 1) a presumption in favor of the parental determination; 2) an opportunity to rebut this presumption with a showing by the non-parents through clear and convincing evidence that the parental determination is not in the child's best interests; and 3) placement of the ultimate burden on the non-parents to establish by clear and convincing evidence that allocation of parenting time to them is in the best interests of the child. In allowing any parenting time to non-parents, the court must make findings of fact identifying those "special factors" on which it relies. The district court abused its discretion by not applying this standard and making the requisite findings of fact when it ordered daytime and overnight stays in the Glabs' household.
Accordingly, we make our rule absolute, setting aside the district court's order for visitation with the Glabs in their household, and return this case to the district court for further proceedings consistent with this opinion.

I.
Julian is the biological father of minor children B.J. and K.J. The Glabs provided foster care to these children during an eleven-month period beginning in late December 2004 during a dependency and neglect ("D & N") case filed against Julian and Coy Summers, the children's biological mother. In December of 2005, the juvenile court granted Julian, who had complied with all conditions imposed as a result of the D & N proceeding, sole custody of B.J. and K.J. The final order of the D & N proceeding made permanent a prior no-contact order between Summers and the children.
Julian allowed the children significant ongoing contact with the Glabs from December 2005 until May 2009, when Julian decided to sever further contact with the Glabs. A summary of this time is as follows. From March to June, 2006, the children lived with the Glabs full time. In the fall of 2006 the children lived with the Glabs on Monday, Tuesday, and Wednesday nights. Thursday through Sunday they resided with their father. Julian and Ms. Glab agreed that, starting in January 2007, B.J. would begin to attend the same school as the Glab's children and from January 2007 until August 2007 both children lived with the Glabs Monday through Thursday. Starting in August 2007 B.J. lived with the Glabs Sundays through Fridays, and in August 2008 both children began living with the Glabs Sunday night through Friday night.
In March of 2009 Julian determined to cease having the children in the Glabs' home, except that he allowed the children to spend two weekends with them in April of 2009, in addition to Mother's Day weekend of May, 2009. The Glabs responded by petitioning for an allocation of parenting responsibilities pursuant to section 14-10-123(1)(c), C.R.S. (2010), on May 1, 2009.
*1131 Julian's decision to allow the Glabs significant parenting time after he had received sole custody of the children resulted in the establishment of a psychological bond between the children and the Glabs. At a hearing before the magistrate on September 24, 2009, Julian testified that the children referred to Mrs. Glab as "Mom," and Mr. Glab as "Daddy Jason." They either called Julian "Daddy Ron," or simply "Daddy." The Glabs handled interactions with doctors and school officials, attended parent-teacher conferences and extra-curricular events, and paid half of the children's school tuition.
Julian acknowledged that both children had formed a "very unique bond" with the Glabs. The magistrate found that, during this three and one-half year period, with Julian's consent, the Glabs had become psychological parents of both children. The magistrate went on to find that, after Julian determined to have his children live exclusively with him, the children adjusted well to life without the Glabs. The children's psychologist observed that the Glabs did not show up in drawings of "important people" in their lives and reintroducing the Glabs back into their lives would disrupt this stability.
The magistrate concluded that the Glabs did not have standing to pursue an APR action under section 14-10-123(1)(c). This statutory section allows a non-parent who has had the physical care of a child for a period of six months or more to petition for parenting time, so long as the non-parent initiates the action within six months of the termination of physical care. The magistrate ruled that, as of the date of the September 2009 hearing, the children had been exclusively within Julian's household for over six months and the Glabs no longer had standing to pursue the APR proceeding. The magistrate found Julian to be a fit parent whose parenting plan was in the best interests of the children.
After a hearing to review the magistrate's ruling, the district court accepted the magistrate's findings, made findings of its own, and concluded that the Glabs did have standing because they had initiated the APR action on May 1, 2009, well within six months of March 2009, when Julian determined to cease having the children live with the Glabs. The district court refused the Glabs' request for a temporary order for parenting time pending the APR proceeding. Consistent with the magistrate's findings, the district court found that granting temporary parenting time to the Glabs would "disrupt the minor children who have adjusted to their current situation which would not be in the best interest of the minor children."
In so ruling, the district court recognized that Julian had a due process interest in the care, custody, and control of his children and the court must presume his decisions to be in their best interests. Accordingly, it ruled that consideration of any temporary or permanent order for non-parent parenting time must proceed under the standards set forth in the Troxel and C.A. cases.
The Glabs then sought appointment of a Child and Family Investigator ("CFI"). The district court granted the motion and appointed Dr. Michael Wilbourn as CFI. After briefly meeting the children, Dr. Wilbourn recommended that they spend three Saturdays with the Glabs, after which he would meet with the children and observe their interactions with Mr. and Mrs. Glab. Over Julian's protests, these visits took place in mid-April, 2010, nearly one year after the children's last contact with the Glabs. Dr. Wilbourn did not report his findings to the court at the next status conference. Instead, he recommended that the court order two Saturday overnight parenting stays in the Glabs' household to assist his report.
Julian objected to the overnight visitations, reasserting that the court could not order any parenting time between the Glabs and his children without clear and convincing evidence to justify interference with his constitutional rights. The district court concluded that the Troxel and C.A. standards are inapplicable to the investigatory stage of an APR proceeding.
The court ordered the overnight stays to occur during the weekends of May 15 and 22, 2010, and Julian petitioned for issuance of our rule to show cause. We accepted jurisdiction pursuant to C.A.R. 21 and now make *1132 our rule absolute, reversing the district court's order.

II.
We hold the constitutional presumption that a fit parent acts in the best interests of the child applies to all stages of an APR proceeding. The applicable standard for consideration of an order granting any parenting time to a non-parent in the face of the parent's objection includes 1) a presumption in favor of the parental determination; 2) an opportunity to rebut this presumption with a showing by the non-parents through clear and convincing evidence that the parental determination is not in the child's best interests; and 3) placement of the ultimate burden on the non-parents to establish by clear and convincing evidence that allocation of parenting time to them is in the best interests of the child. In allowing any parenting time to non-parents, the court must make findings of fact identifying those "special factors" on which it relies. The district court abused its discretion by not applying these standards and making the requisite findings of fact when it ordered daytime and overnight stays in the Glabs household.

A.

Standard of Review
We defer to the magistrate and district courts' findings of fact if they are supported by the evidence and we review conclusions of law de novo. Ryder v. Mitchell, 54 P.3d 885, 889 (Colo.2002); Freedom Colo. Info. Inc. v. El Paso Cnty. Sheriff's Dep't, 196 P.3d 892, 897 (Colo.2008).

B.

Allocation of Parental Responsibilities Pursuant to Statute
Once a non-parent has standing under section 14-10-123 to pursue an allocation of parental responsibilities, the district court then considers whether to allow parenting time to the non-parent. § 14-10-124(1.5)(a), C.R.S. (2010). "Parenting time" is not specifically defined, but it includes what the statute formerly referred to as "visitation." § 14-10-103(3), C.R.S. (2010). In 1993, in making alterations to the Uniform Dissolution of Marriage Act, the General Assembly adopted the term "parenting time" to subsume "visitation," and the two words have been used interchangeably. Id.; In re C.T.G., 179 P.3d 213, 217 (Colo.App.2007); In re Marriage of Ohr, 97 P.3d 354, 357 (Colo. App.2004). The legislative declaration for the amendment stated that the
term `visitation' when used in the Colorado Revised Statutes to refer to the time a noncustodial parent spends with his or her child has a connotation which does not adequately express the importance of the relationship between the noncustodial parent and the child. The task force on family issues . . . has recommended that the term be changed to `parenting time'. It is the intent of the general assembly in making this change to reflect the importance of the time a noncustodial parent spends with his or her child. It is not the intent of the general assembly to modify or change the meaning of the term `visitation' nor to alter the legal rights of a noncustodial parent with respect to the child as a result of changing the term `visitation' to `parenting time.'
Ch. 165, sec. 1, 1993 Colo. Sess. Laws 575. Consequently, the term "parenting time" refers in general to the time a child spends away from his or her primary residence in the household of a person who exercises parental responsibilities. Frank L. McGuane, Jr. & Kathleen A. Hogan, Colorado Family Law & Practice § 28:44 (2d ed.2009).
Upon commencement of an APR proceeding, any party may move for a temporary order, and the court may allocate temporary parental responsibilities after a hearing. § 14-10-125, C.R.S. (2010). These orders determine parental responsibilities pending final orders and are not determinative of final, permanent orders. In re Marriage of Fickling, 100 P.3d 571, 574 (Colo. App.2004).
We have long recognized application of the "best interests of the child" standard to determinations of child custody. *1133 Wilson v. Mitchell, 48 Colo. 454, 465, 111 P. 21, 25 (1910). The General Assembly incorporated this standard into allocation of parental responsibilities proceedings in 1963. § 14-10-124. Although a non-parent may have standing under section 14-10-123, there is a presumption that parents have a first and prior right to the custody of their child as between a parent and a non-parent. Wilson, 48 Colo. at 467, 111 P. at 26; In re Custody of C.C.R.S., 892 P.2d 246, 256 (Colo. 1995). This presumption may be rebutted by evidence establishing that the best interests of the child are better served by granting parenting time to the non-parent. Wilson, 48 Colo. at 467, 111 P. at 26; C.C.R.S., 892 P.2d at 256.
In any proceeding that involves allocation of parental responsibilities the court may appoint an individual to serve as a CFI. § 14-10-116.5, C.R.S. (2010). The CFI may be an attorney, a mental health professional, or any other person with appropriate training and qualifications who the court finds to have an independent perspective. Id. The role of the CFI, as defined by statute, is to investigate, report, and make recommendations to the court on issues that affect the best interests of the minor children involved in a domestic relations case. Id. The CFI must take into consideration the relevant factors for determining the best interests of the child as specified in section 14-10-124.[1]Id.
Neither the statute nor Chief Justice Directive 04-08 specifically addresses the issue of investigatory parenting time, but the CFI has a degree of flexibility and must conduct his or her investigation sufficient to provide competent opinions. CJD 04-08 standard 8; CJD 04-08 standard 8 (comment) ("A CFI should use methods of data collection that are consistent with accepted professional standards."). Despite the breadth of the CFI's function, the court, in setting forth the CFI's duties, "should provide for the least intrusive means of ascertaining the child's best interests." CJD 04-08 IV(B) (comment). Ultimately it is the role of the court to weigh the CFI's recommendations pursuant to the appropriate standards to determine whether they are in the children's best interests. CJD 04-08 standard 3 (comment); In re Marriage of McNamara, 962 P.2d 330, 334 (Colo.App.1998) (court is free to reach its own conclusions and is not required to follow the CFI's recommendation). Only the court has the authority to allocate parenting time and constitutional principles instruct the trial court's consideration.

C.

Due Process Affords Parental Determinations Special Weight
When the district court considers whether to allocate parenting time to a non-parent over the objection of a parent, it must proceed in accordance with the standards set forth in Troxel and C.A. Troxel, 530 U.S. at 70, 120 S.Ct. 2054; C.A., 137 P.3d at 327. Both of these decisions address the rights of a parent vis-à-vis the application of a non-parent who seeks parenting time.
In Troxel, the U.S. Supreme Court held that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children. Troxel, 530 U.S. at 65, 120 S.Ct. 2054 *1134 (finding this liberty interest "perhaps the oldest of the fundamental liberty interests recognized by this Court"). There is a presumption that fit parents act in the best interests of their children; so long as a parent is fit, there will normally be no reason for the State to second-guess the ability of that parent to make the best decisions concerning the rearing of his or her children. Id. at 72-73, 120 S.Ct. 2054 ("[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made.").
The Court in Troxel reviewed Washington's very broad third-party visitation statute. In regard to non-parent visitation and a parent's right to the care, custody, and control of his or her children, the Court ruled that due process requires a court to give "special weight" to a parent's determination whether or not to allow non-parent visitation. Id. at 72, 120 S.Ct. 2054 ("[T]he visitation order in this case was an unconstitutional infringement of [the parent's] fundamental right to make decisions concerning the care, custody, and control of her two daughters."). For a court to interfere with a parent's fundamental right to make decisions concerning his or her children, a court order must be founded on "special factors" that justify the State's interference. Id. at 68, 120 S.Ct. 2054.
The Supreme Court left to each state to determine a standard by which "special weight" would be afforded to parental determinations. In order to accommodate the "best interests of the child" test and the "special weight" and "special factors" requirements of Troxel, we announced a three-part test for issuance of an order for grandparent visitation. C.A., 137 P.3d at 319. First, a presumption exists in favor of the parental visitation determination. Id. Second, to rebut this presumption, the grandparent must show through clear and convincing evidence that the parental determination is not in the child's best interests. Id. Finally, the ultimate burden rests on the grandparent to establish by clear and convincing evidence that the visitation schedule they seek is in the best interests of the child. Id. at 322. After applying this standard, a court that orders visitation to a grandparent must make findings of fact and conclusions of law identifying those "special factors" on which it relies. Id.
Applying our C.A. decision, the Colorado court of appeals recently found that Troxel, C.A., and their progeny are applicable to all non-parent requests for an APR. In re Parental Responsibilities of Reese, 227 P.3d 900, 903 (Colo.App.2010). In that case, the court held that when a non-parent seeks an allocation of parental responsibilities contrary to the wishes of a parent, the parental determination of the child's best interests should be given special weight. Id. This presumption in favor of the parent's decision can be rebutted only by findings based on clear and convincing evidence that the grant of parental responsibilities to the non-parent is in the child's best interests. Id. Reese is consistent with our holdings in C.C.R.S and C.A.
In APR proceedings, a court may not order visitation to a non-parent except in accordance with the Troxel and C.A. standards. A parent's liberty interest in the care, custody, and control of his or her child may only be "infringed when the parent's determination regarding the best interests of the child is overcome by clear and convincing proof of relevant factors and the court's determination of the best interests of the child." Reese, 227 P.3d at 903. In making such a determination, the court must consider the factors listed in section 14-10-124(1.5)(a)-(b), giving paramount consideration to the "physical, mental, and emotional conditions and needs of the child."

D.

Application to this Case
The district court allowed parenting time to the Glabs upon recommendation of the CFI and against the wishes of Julian, a parent who enjoyed sole custody of the children under a previous court order. First, the court ordered three Saturday visits in April, 2010. Then, the district court scheduled two overnight visits for May. While the *1135 district court conceded that the Glabs could not under Troxel and C.A. obtain temporary or final orders for parenting time without clear and convincing evidence that Julian's decision was not in the best interests of the children, the court did not apply this standard to the daytime or overnight visits the CFI recommended. The court made no findings of fact laying out the reasons, or "special factors" for awarding the Glabs any parenting time, nor did it find that the Glabs showed by clear and convincing evidence that the visits would be in the children's best interests.
The Glabs argue that, because the ordered visitations are of short duration, the Troxel and C.A. standards are inapplicable. We disagree. Both the magistrate and the district court found that Julian is a fit parent who has sole custody of the children. Under the Troxel and C.A. holdings, he enjoys a fundamental constitutional right to make parenting decisions. Troxel, 530 U.S. at 66, 120 S.Ct. 2054; C.A., 137 P.3d at 327. Whether to allow any daytime or overnight visits, and if so, under what circumstances, is typically a parent's decision to make. In an APR proceeding initiated by non-parents, the constitutional presumption in favor of the parent's decision applies to the case at its outset, and endures throughout the proceedings unless overcome in accordance with due process standards. Troxel, 530 U.S. at 68, 120 S.Ct. 2054; C.A., 137 P.3d at 319. There is no investigatory exception. If this were not the case, a parent's fundamental liberty interest in raising the child would be suspended, impairing the parent's fundamental right to make parental determinations. Absent the parental presumption in the investigatory phase, nothing would circumscribe a court from ordering repeated investigatory parenting time to a non-parent.
The Troxel and C.A. standards are meant to guide and circumscribe a court's determination to allow any parenting time by a non-parent. A fit parent has a fundamental right and responsibility for the care, custody, and control of the child. Troxel, 530 U.S. at 65, 120 S.Ct. 2054. For a court to grant any parenting time over parental opposition requires clear and convincing evidence to justify interference with the parent's constitutional right, and the court must make findings of fact laying out the "special factors" on which it relies. Troxel, 530 U.S. at 68, 120 S.Ct. 2054; C.A., 137 P.3d at 322.
Here, the children have been in Julian's sole care for well over a year. The magistrate found them to be adjusting well to life with their father. The district court also recognized that re-inserting the Glabs into the children's lives and allowing the children to re-establish a bond with the Glabs, absent any findings of special need, could well confuse the children and disturb the stability that Julian had worked to foster and preserve.
While acknowledging the appropriate legal standard, the district court ordered visitations based solely on the CFI's recommendations, without subjecting the court's determination to the required level of scrutiny. The hearing transcripts reveal that the court had initially expected the CFI to make a prompt report based on a multitude of investigatory avenues short of court-ordered visitations. These included interviewing Julian, the Glabs, and the children, gathering information from third parties, reviewing records, and checking criminal histories or obtaining drug-testing. See CJD 04-08 standard 8 (comment) (laying forth potential means by which a CFI may collect data). All of these options would provide a less intrusive means of ascertaining the children's best interests, as required by Chief Justice Directive 04-08. CJD 04-08 IV(B) (comment).
The district court ordered visitation with the Glabs in the absence of proceeding in accordance with the applicable standards and making the requisite findings, thereby abusing its discretion.

III.
Accordingly, we make the rule absolute, reverse the district court's visitation order, and return this case to the district court for further proceedings consistent with this decision.
NOTES
[1] These factors include:

(I) The wishes of the child's parents as to parenting time;
(II) The wishes of the child if he or she is sufficiently mature . . .;
(III) The interaction and interrelationship of the child with his or her parents, his or her siblings, and any other person who may significantly affect the child's interests;
(IV) The child's adjustment to his or her home, school, and community;
(V) The mental and physical health of all individuals involved . . .
(VI) The ability of the parties to encourage the sharing of love, affection, and contact between the child and the other party;
(VII) Whether the past pattern of involvement of the parties with the child reflects a system of values, time commitment, and mutual support; . . .
(IX) Whether one of the parties has been a perpetrator of child abuse . . .
(X) Whether one of the parties has been a perpetrator of domestic violence . . .
(XI) The ability of each party to place the needs of the child ahead of his or her own needs.
§ 14-10-124(1.5)(a).