243 P.3d 244
The PEOPLE of the State of Colorado, Petitioner, In the INTEREST OF Minor Children A.J.L., aka A.J.C.; A.K.M.H.; and Q.D.J.W.; and Concerning A.P.L., Respondent.
No. 09SC1036.
Supreme Court of Colorado, En Banc.
Nov. 30, 2010.
Rehearing Denied Dec. 20, 2010.* Robert W. Loeffler, Clear Creek County Attorney, Sue S. Thibault, Assistant Clear Creek County Attorney, Georgetown, Colorado, Attorneys for Petitioner. Judith J. Carlson, Frisco, Colorado, Attorney for Respondent. Anne E. Parmley, P.C., Anne E. Parmley, Breckenridge, Colorado, Guardian Ad Litem. Justice HOBBS delivered the Opinion of the Court. We granted certiorari in People in the Interest of A.J.L., No. 09CA0787, 2009 WL 4173713 (Colo.App., November 25, 2009), to determine whether the court of appeals applied the proper standard of review in reversing the trial court's decision to terminate the parent-child legal relationship between A.P.L. ("mother") and children A.K.M.H. ("daughter") and Q.D.J.W. ("son"). 1 Pursuant to section 19-3-604(1)(c), C.R.S. (2010), the trial court found and concluded mother had not reasonably complied with her court-approved treatment plan, that she was unfit, and that her conduct or condition was unlikely to change within a reasonable time. Based on these findings and conclusions, it terminated the parent-child legal relationship between mother and her minor children, daughter and son. The court of appeals reversed, concluding the People failed to prove, by clear and convincing evidence, that mother is unfit and cannot become fit within a reasonable time. We hold that the court of appeals did not properly apply the clearly erroneous standard of review to the trial court's findings. Ample evidence exists in the record supporting the trial court's findings and its legal conclusion that mother is unfit to parent son and daughter and her conduct or condition is unlikely to change within a reasonable time. We agree and uphold the trial court's order terminating the parent-child relationship.
I. Daughter and son have different fathers. Daughter was born to mother in January 2002, and the parent-child legal relationship between daughter and her father was subsequently terminated. In December 2005, son was born to C.W. and mother. C.W.'s parental rights to son were terminated by the trial court on an unopposed motion for summary judgment. The trial court found that C.W. and mother both have a history of domestic violence, substance abuse, and of physically abusing and neglecting their children. Prior to moving to Colorado, mother was involved with state social services agencies in Washington and Idaho due to abuse and neglect of her children. C.W. has an outstanding warrant for his arrest in Colorado and reports an outstanding warrant for his arrest in Nevada. At the time of trial Mother and C.W. were still in a relationship and lived together in Montana. They had another child together since moving to Montana. That child is not a subject of this proceeding. The trial court found that Clear Creek County Department of Human Services ("CCDHS") became involved with the family beginning in September 2005, following a domestic violence incident. In November 2005, mother was charged with child abuse in Clear Creek County for beating her oldest child.2 CCDHS offered individual and family counseling, but mother did not comply. In September 2006, multiple witnesses saw mother kick her oldest child and lock him out of the house. Following that incident, CCDHS wrote a letter to mother, requesting that she submit to random urinalysis testing and participate in a drug and alcohol evaluation and family counseling. Mother did not respond to these requests, and the People filed a petition in dependency and neglect on October 24, 2006. The People filed a stipulated motion for continued adjudication in January 2007, and the trial court entered an order continuing adjudication so long as mother and C.W. successfully completed the treatment plan agreed to by the parties. The treatment plan required Mother to: financially support her children, provide copies of her children's social security cards and birth certificates, stay clean and sober, complete a drug and alcohol evaluation, provide the names and addresses of relatives for the children, stay informed of the case, stay violence free, be mentally healthy, attend to her children's medical and mental health needs, and be able to parent her children. The trial court found that mother and C.W. failed to comply with the treatment plan. In February 2007, mother tested positive for methamphetamines. On March 13, 2007, mother was discharged from outpatient drug treatment for failing to attend therapy and for failing to comply with her treatment plan. The People filed a motion for adjudication in dependency and neglect, claiming that mother and C.W. failed to comply with the treatment plan in several ways. Son, daughter, and mother's oldest child were ordered into temporary protective custody.3 On March 28, 2007, the trial court entered an order and decree of adjudication, finding mother and C.W. in violation of the terms and conditions of the stipulated motion for continued adjudication, and ordering daughter, son, C.W.'s daughter T.M.W., and mother's oldest son be adjudicated dependent and neglected. The trial court also ordered mother to complete the Salvation Army's six-month inpatient drug rehabilitation program, and ordered C.W. and mother to comply with the treatment plan. Mother and C.W. continued to fail to comply with the treatment plan. Mother did not consistently submit to random urinalysis tests, did not consistently make phone calls to her oldest son, did not consistently attend substance abuse treatment, did not participate in required feedback sessions following therapeutic visits with her children, and failed to enter the six-month inpatient drug treatment program. In May 2007, mother and C.W. moved to Montana, against the advice of the CCDHS treatment team. Mother stated she wanted to move to Montana to get away from C.W. and because she did not trust the CCDHS treatment team. The trial court found mother deceived CCDHS regarding her relationship with C.W. Mother initially denied that she had contact with C.W. after her arrival in Montana. However, a letter from one of mother's Montana treatment providers to the CCDHS treatment team in June 2007 reported that C.W. followed mother to Montana. The letter referred to C.W. as mother's "significant other." In September 2007, the CCDHS treatment team asked mother where they could find C.W. in order to provide him information on the case, and mother denied having any knowledge of his location. The trial court found that mother knew of the CCDHS treatment team's concern regarding her relationship with C.W., and that she deceived the treatment team regarding that relationship. In September or October 2007, mother admitted to the CCDHS caseworker that she and C.W. lived together. The caseworker testified that throughout the entire case, the team expressed concern about her relationship with C.W. because of his general lack of participation and failure to complete an interactional evaluation with son. In response, mother told the treatment team she was separated from C.W. and that she would seek a restraining order to prevent him from contacting her children. After CCDHS filed motions for termination in the case in September 2008, it hired a private investigator to locate C.W. The investigator discovered C.W. lived with mother and that they had signed a lease together. The trial court found that C.W. refused to engage in the treatment plan, disobeyed the court's orders in his criminal case, violated the terms and conditions of his probation, has an outstanding warrant for his arrest in Colorado, and failed to contest the People's motion to terminate his parental rights to son. The trial court found unbelievable mother's assertion that she would end her relationship with C.W. if the children werereturned to her. It found that a home including C.W. would not be a safe and stable home for the children. Upon arrival in Montana, mother contacted South West Chemical Dependency ("SWCD") and entered an outpatient substance abuse program. The trial court found that she deceived the SWCD providers by failing to inform them she was court-ordered to enter inpatient treatment. The trial court acknowledged that she successfully completed substance abuse treatment at SWCD, has been clean and sober since June 2007, and SWCD providers reported she is a role model and leader for others in treatment. The trial court's treatment plan had required mother to submit to a psychological evaluation. The practitioner who performed the evaluation testified as an expert in psychology at the trial. Based on her evaluation, the psychologist diagnosed mother with post traumatic stress disorder, cyclothymia, histrionic personality disorder with borderline narcissistic features, and poly-substance abuse. She recommended mother receive individual therapy for eighteen months to two years, family therapy, and substance abuse treatment. She also testified that mother was dishonest and minimized her problems. Due to these issues, her evaluation warned that mother would likely engage in "splitting," where she provided accurate information to some, but not others. She testified that mother's tendency to lie and withhold information means that treatment providers working with mother should not rely solely on her self-reporting. Finally, she testified that mother's continued dishonesty suggests mother has not addressed the mental health issues identified in the evaluation. Mother completed this evaluation in January 2007, and the psychologist testified that nothing she had since reviewed indicated mother was now capable of being a better parent to son and daughter. In September 2007, a certified psychiatric nurse specialist completed an interactional assessment of mother and son. Although the specialist noted several positive aspects of mother's interactions with son, she ultimately recommended termination of the parent-child legal relationship between the two, noting mother's failure to acknowledge her past abuse of the children, her inability to reflect on how her behavior affected the children, and her lack of candor regarding her history of domestic violence and drug abuse. At the time of the interview, mother was pregnant with C.W.'s and her newest child, but told the specialist she was not pregnant. The specialist also testified that mother's ability to parent the child born to her and C.W. in Montana does not necessarily relate to her ability to parent daughter and son, who were removed from her home and experienced trauma due to mother's actions. One of mother's therapists at SWCD, who testified as an expert in substance abuse and behavioral counseling, stated that mother completed a full mental health evaluation in 2007 in Montana, and that it did not suggest mother had a personality disorder. The evaluation was never produced at trial or provided to CCDHS, despite numerous requests. She also testified that mother attended regular group therapy sessions, Narcotics Anonymous and Alcoholics Anonymous meetings, dialectical behavioral therapy, and individual therapy sessions in Montana. She testified that C.W. took anger management and domestic violence classes in Montana and that he and mother had participated in couples therapy. In December 2008, a psychologist who testified as an expert for mother evaluated mother's interaction with the child born to her and C.W. in Montana. He concluded mother was a motivated, sensitive, and empathetic parent with reasonably good parenting skills. He was not allowed to observe mother with daughter and son. When the psychologist testified at trial, he claimed that CCDHS made a decision not to reunite mother with son and daughter early in the case, but he did not support his testimony with evidence. As a result, the trial court concluded that his testimony was "speculative and engineered to create an opinion to support [m]other's case and as a whole, substantially lacked credibility." At trial, the People produced substantial evidence and elicited testimony from witnesses supporting its contention that mother continues to deny the severity of abuse sheinflicted on son and daughter. They also produced evidence and elicited testimony from witnesses showing that mother's inability or unwillingness to acknowledge the abuse and its impact on her children placed a substantial roadblock between mother and her ability to safely and effectively parent son and daughter. While on the stand at trial, mother admitted to abusing her oldest child, but she denied that she ever physically abused son and daughter or withheld food from them. Contrary to mother's testimony, the children reported, and the trial court found that mother left the children without supervision and withheld food; mother and C.W. physically disciplined the children with belts, spoons, and hands; mother confined the children to a dark closet for long periods of time; and the children witnessed domestic violence between mother and C.W. The trial court also found that mother had not demonstrated adequate recognition of and concern regarding the abuse and neglect she inflicted on the children. In January and February 2009, the trial court held a three-day trial on the People's motion to terminate the parent-child legal relationship between mother and son and daughter. It found mother's credibility low. It also found that mother successfully addressed her substance abuse issues, but that she still had major problems to address, including a pattern of deception in her dealings with CCDHS, her inability to provide a safe environment for the children because of her relationship with C.W., and her unwillingness to address her own mental health issues. As a result, the court found mother unfit as a parent and unlikely to change within a reasonable period of time. It also found no less drastic alternative available and that termination was in the children's best interests. The court of appeals reversed, holding that the trial court could not have reasonably found, by clear and convincing evidence, that it was highly probable in January and February 2008 that mother was unfit and her conduct or condition was unlikely to change within a reasonable time. To support its holding, the court of appeals cited what it referred to as "more recent evidence" that it believed created doubt concerning the trial court's findings, including testimony that: a mental health evaluation performed in Montana showed mother suffered no serious psychological problems; mother entered counseling in Montana and was highly motivated; C.W. completed domestic violence and anger management treatment in Montana; mother and C.W. were successfully parenting their newest child; SWCD providers displayed no concerns about mother's relationship with C.W.; and one SWCD provider did not believe mother had ever lied to her. The court also noted that no reports existed showing that mother was dishonest with SWCD providers. We granted the People's petition for certiorari and reverse the judgment of the court of appeals.
II. We hold that the court of appeals did not properly apply the clearly erroneous standard of review to the trial court's findings. Ample evidence exists in the record supporting the trial court's findings and its legal conclusion that mother is unfit to parent son and daughter and her conduct or condition is unlikely to change within a reasonable time. We agree and uphold the trial court's order terminating the parent-child legal relationship.
A.Standard of Review and Applicable Law We review questions of law de novo. Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dept., 196 P.3d 892, 897 (Colo.2008). Whether the court of appeals applied the correct legal standard to a case under review is a matter of law. Id. at 897-98. C.R.C.P. 52 provides that, in appellate review, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." The credibility of witnesses, the sufficiency, probative value, and weight of the evidence, and the inferences and conclusions to be drawn from it are within the trial court'sdiscretion. K.D. v. People, 139 P.3d 695, 702 (Colo.2006). Thus, while a trial court may properly attach more weight to more recent evidence, People in Interest of L.D., 671 P.2d 940, 945 (Colo.1983), whether it should do so is necessarily determined by its assessment of witness credibility, and its analysis of the sufficiency and probative value of the evidence presented at trial. Therefore, the decision of whether to afford more weight to more recent evidence falls squarely within the discretion of the trial court. In Page v. Clark, we explained why it is important to defer to the trial court, particularly when it hears contradictory testimony on material issues:
The sanctity of trial court findings is derived from the recognition that the trial judge's presence during the presentation of testimonial evidence provides an unparalleled opportunity to determine the credibility of witnesses and the weight to be afforded the evidence which is before the court ... It is impossible to determine from the bare pages of the record whose testimony should be given credit relating to the facts.
197 Colo. 306, 313, 592 P.2d 792, 796 (1979); see also M.D.C./Wood, Inc. v. Mortimer, 866 P.2d 1380, 1383-84 (Colo.1994) (reversing the court of appeals where the trial court's findings were supported by the record and the court of appeals erred in substituting its findings for those of the trial court). Accordingly, we set aside a trial court's factual findings only when they are "so clearly erroneous as to find no support in the record." People in Interest of C.A.K., 652 P.2d 603, 613 (Colo.1982); Gebhardt v. Gebhardt, 198 Colo. 28, 30, 595 P.2d 1048, 1050 (1979) ("It is axiomatic that an appellate court cannot substitute itself as a finder of fact.").
B.Termination of the Parent-Child Legal Relationship Parents have a fundamental liberty interest in the care, custody, and control of their children. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); See also In re Adoption of C.A., 137 P.3d 318, 324 (Colo.2006); Glab v. Julian, 242 P.3d 1128, 1133-34 (Colo.2010). Therefore, terminating parental rights is a decision of "paramount gravity," and trial courts must strictly comply with the termination standards set forth in the Colorado Children's Code. K.D., 139 P.3d at 700. When a trial court considers terminating the parent-child legal relationship, it must give primary consideration to the physical, mental, and emotional conditions and needs of the child or children involved. § 19-3-604(3), C.R.S. (2010). Before the parent-child legal relationship may be terminated, the child must first be adjudicated dependent or neglected, pursuant to section 19-3-102, C.R.S. (2010). When the trial court's decree in a dependency and neglect proceeding does not terminate the parent-child legal relationship, the trial court is required to approve an appropriate treatment plan. § 19-3-508(1), C.R.S. (2010). An appropriate treatment plan is reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time and relates to the child's needs. § 19-1-103(10), C.R.S. (2010). A critical bonding and attachment process occurs before children reach six years of age, and children who have not bonded with a primary adult during that time suffer emotional damage that can lead to chronic psychological problems and antisocial behavior. See § 19-1-102(1.6), C.R.S. (2010). Accordingly, the General Assembly determined that expedited placement procedures should be used to ensure that children under six years of age who are removed from their homes are placed in permanent homes "as expeditiously as possible." Id. In such circumstances, the Children's Code requires that a child be placed in a permanent home no later than twelve months after the original placement outside the home, unless the best interests of the child dictate otherwise. § 19-3-703, C.R.S. (2010); K.D., 139 P.3d at 699. Section 19-3-604(1) sets forth the criteria a trial court must consider in a termination proceeding and provides three series of factual findings on which a trial court may baseits decision to terminate the parent-child legal relationship. At issue in this case is section 19-3-604(1)(c). Under section 19-3-604(1)(c), the trial court may terminate the parent-child legal relationship if it finds, by clear and convincing evidence, that the child has been adjudicated dependent or neglected and (1) an appropriate treatment plan approved by the court was not reasonably complied with by the parent or was not successful, or could not be devised, (2) that the parent is unfit, and (3) that the conduct or condition of the parent is unlikely to change within a reasonable time. We now address the three-part framework for these findings. First, if the child at issue is under six years of age when the petition is filed, the trial court shall not find a parent in reasonable compliance with her treatment plan in two situations. § 19-3-604(1)(c)(I). The trial court shall not find a parent in reasonable compliance with her treatment plan if: she failed to attend visitations with the child provided for in the treatment plan and cannot show good cause for the failure, or she is still plagued by the same problems addressed by the treatment plan without adequate improvement, and is unable or unwilling to "provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions despite earlier intervention and treatment for the family." § 19-3-604(1)(c)(I)(A)-(B); C.S. v. People, 83 P.3d 627, 641 (Colo.2004). Second, to find a parent unfit for the purposes of section 19-3-604(1)(c), the trial court must find that the
continuation of the legal relationship between parent and child is likely to result in grave risk of death or serious bodily injury to the child or that the conduct or condition of the parent ... renders the parent ... unable or unwilling to give the child reasonable parental care, to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions.
§ 19-3-604(2) (emphasis added). A parent's refusal to acknowledge the impact of her prior behavior on her children may prevent that parent from providing reasonable parental care. People ex rel. K.T., 129 P.3d 1080, 1082 (Colo.App.2005). Choosing to continue a relationship with a person who poses a threat to the welfare of the child may prevent the parent from providing the safe parenting necessary to meet the child's needs. People ex rel. C.T.S., 140 P.3d 332, 334 (Colo.App.2006). Section 19-3-604(1)(c)'s third and final requirement is that the court find, by clear and convincing evidence, that the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. § 19-3-604(1)(c)(III); C.S., 83 P.3d at 642. What constitutes "a reasonable time" is relative and should be determined based on the child's physical, mental, and emotional conditions and needs. K.D., 139 P.3d at 700. To determine whether the parent's conduct will change within a reasonable time, "the court may consider whether any change occurred during the pendency of the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." Id. To terminate the parent-child legal relationship, the trial court's findings must be supported by clear and convincing evidence. § 19-3-604(1). Clear and convincing evidence is evidence persuading the fact finder that the contention is highly probable. People v. Taylor, 618 P.2d 1127, 1136 (Colo.1980). The clear and convincing evidence standard requires proof by more than a "preponderance of the evidence," but it is more easily met than the "beyond a reasonable doubt" standard used in criminal proceedings. Id.
C.Application to this Case The issue before us is whether the court of appeals erred when it concluded the trial court could not have reasonably found, by clear and convincing evidence, that the second and third prongs of section 19-3-604(1)(c) were established-that mother was unfit and her conduct or condition was unlikelyto change within a reasonable time.4 The court of appeals' judgment was largely based on its determination that the trial court should have attributed more weight to the more recent evidence and testimony from mother and C.W.'s Montana providers. We disagree. Existing case law does not require a trial court conducting a parental rights termination proceeding to attribute more weight to more recent evidence. While doing so may be appropriate in some instances, e.g., L.D., 671 P.2d at 945, we do not require this. Rather, appellate courts should acknowledge the trial judge's unique opportunity to be present at trial and the advantage this affords the trial court in determining witness credibility and the weight, sufficiency, and probative value of evidence. K.D., 139 P.3d at 702; Page, 197 Colo. at 313, 592 P.2d at 796. In the instant case, the court of appeals cited People ex rel. T.D., 140 P.3d 205, 219 (Colo.App.2006), for the proposition that the trial judge must attribute more weight to the most recent evidence. In T.D., the court of appeals cited L.D., 671 P.2d at 945, to support the same contention. L.D. places no such constraint on trial judges. In L.D., we considered an appeal from a trial court order terminating the parent-child legal relationship between two children and their parents. Id. at 940. Earlier evaluations of the children concluded that parental rights should not be terminated as to either child, but that visitation between one of the children and the parents be carefully monitored. Id. at 941. Later evaluations strongly recommended terminating parental rights and prohibiting visitation. Id. at 944. The trial court decided not to resume visitation between the children and parents, and we approved of its apparent decision to attach more weight to the more recent evaluations. Id. at 944, 945. L.D indicates our deference to the trial court's unique ability to assess and attach weight to evidence presented at trial. Creating a categorical rule requiring courts to attach more weight to more recent evidence would be antithetical to our long-standing recognition that the trial court is in the best position to determine witness credibility, and the weight, sufficiency, and probative value of the evidence. See K.D., 139 P.3d at 702; Page, 197 Colo. at 313, 592 P.2d at 796. Having determined that the trial court was not required to place more weight on evidence from the Montana providers, we next consider the trial court's findings and conclusions that mother was unfit and unlikely to change within a reasonable time. We address each finding and conclusion in turn. 1. Mother's Fitness The trial court found and concluded that mother's conduct or condition rendered her unable to give son and daughter reasonable parental care, including the nurturing and safe parenting sufficiently adequate to meet their physical, emotional, and mental health needs and conditions. Consistent with section 19-3-604(2)'s requirements for finding a parent unfit, the trial court reached its conclusion based on findings that mother has a history of domestic violence, is unable to recognize the harm she caused her children, and cannot provide them a safe home because of her inability to end her relationship with C.W. Unless we determine that these findings are "so clearly erroneous as to find no support in the record," we must uphold the trial court's factual findings. See C.A.K., 652 P.2d at 613. The court of appeals acknowledged that the record supported these findings. Specifically,it noted that testimony from the CCDHS caseworker and reports regarding domestic violence between C.W. and mother before they moved to Montana confirm their history of domestic violence. It also noted that termination of C.W.'s parental rights after he stopped cooperating with CCDHS suggested he had not corrected the problems that led CCDHS to consider him a danger to the children. Finally, it acknowledged that mother's January 2007 psychological evaluation confirmed that she suffered from serious mental health problems. Despite acknowledging that the record did, in fact, contain support for the trial court's findings, the court of appeals nonetheless reversed the trial court's order of termination. It did so based on its belief that more recent evidence created substantial doubt regarding the trial court's findings. To support its contention, it cited:
1. testimony from an SWCD provider that a full mental health evaluation completed in Montana showed no personality disorder or other serious psychological problem, that mother received behavioral therapy and individual counseling in Montana, and that mother was very motivated and doing well in treatment;
2. reports from an SWCD provider that C.W. had completed domestic violence and anger management treatment, that he and mother were successfully parenting their newest child together, and that mother was "wonderful" with the baby and other children;
3. a lack of concern from SWCD providers about mother's relationship with C.W., and the lack of evidence of domestic violence between the two since moving to Montana; and
4. a lack of reports from SWCD providers that mother was dishonest, and testimony from one SWCD provider that she did not believe mother had been dishonest with her.
Because the trial court could have reasonably found that this evidence deserved less weight than other evidence supporting its findings, we conclude that the court of appeals improperly substituted its own judgment for that of the trial court regarding the credibility of witnesses, and the weight, sufficiency, and probative value of the evidence. See K.D., 139 P.3d at 702. First, the trial court could reasonably attach more weight to the psychological evaluation of mother performed in Colorado for several reasons. The SWCD provider who testified at trial could not provide a copy of the Montana evaluation, and she did not perform the evaluation herself. Unlike the evaluation the SWCD provider claimed was performed regarding mother in Montana, a copy of the 2007 evaluation performed in Colorado was available for review by the parties, is a part of the record, and the psychologist who performed the evaluation testified at trial. That psychologist testified to mother's strong desire to please others, her habit of self-reporting in an overly positive light, and the importance of corroborating mother's self-reports through questioning of collateral sources. On cross-examination, the SWCD provider who testified about the Montana evaluation indicated that it included a denial monitor designed to discover dishonest responses, yet she admitted that the evaluation was completed without making any contact with the CCDHS treatment team to corroborate mother's self-reports. The trial court could not review the Montana evaluation, and the clinician who performed that evaluation did not testify at trial. Thus, the trial court could reasonably conclude that it deserved less weight since its veracity could not be evaluated. Therefore, the court of appeals' determination that the Montana evaluation deserved more weight because it was more recent was misguided. It should not have substituted its own evaluation of the weight of the Montana evaluation for that of the trial court. See K.D., 139 P.3d at 702. Second, the mere fact that mother received behavioral therapy and individual counseling in Montana did not require the trial court to find mother had addressed the mental health issues that made it impossible for her to effectively parent son and daughter. Ample evidence in the record showed that mother continues to deny the harm she caused son and daughter and that she must acknowledgethat harm before she can safely parent them. Therefore, regardless of whether she engaged in therapy in Montana, the trial court could reasonably find that the psychological problems preventing her from being a good parent to son and daughter persist. Third, despite evidence cited by the court of appeals to the contrary, the trial court could reasonably find C.W.'s presence in mother's home renders it unsafe for son and daughter. The court of appeals concluded that the trial court's findings were cast in serious doubt by more recent evidence indicating that: C.W. completed domestic violence and anger management counseling in Montana; C.W. was a good father to his newest child; SWCD providers were not concerned about mother's relationship with C.W.; and there had been no reports of domestic violence between C.W. and mother since they moved to Montana. However, as the court of appeals acknowledged, the trial court's determination that C.W.'s presence in the home would render it unsafe for son and daughter is supported by the fact that C.W. refused to cooperate with CCDHS. There is other evidence in the record supporting the trial court's finding that C.W.'s presence would pose a threat to son and daughter. For example, C.W. acquiesced to termination of his parental rights to son. The trial court could reasonably construe this as an indication of his resistance and lack of commitment to changing the behaviors that led to removal of the children by CCDHS. Such an inference is corroborated by statements C.W. made to the psychologist who conducted his 2007 court-ordered psychological evaluation in Colorado. In that evaluation, C.W. reported that there is an outstanding warrant for his arrest in Nevada. According to C.W., that warrant resulted from C.W.'s failure to complete court-ordered anger management classes after he was convicted on domestic violence charges in Nevada in 2001. C.W. stated to the psychologist that he stopped attending the classes because he felt they did not apply to him. The psychologist diagnosed C.W. with mixed personality disorder with narcissistic, antisocial, and dependent features, and stated that his tendency to gloss over problems would likely make it difficult for a therapist to get an accurate picture of what is happening in his life. The trial court was tasked with weighing this voluminous and detailed evidence of ongoing, serious problems with anger management and domestic violence against assurances from SWCD that he had engaged in anger management and domestic violence counseling. Further, because the clinician who provided that counseling did not testify, the trial court could reasonably conclude that C.W.'s completion of some counseling did not require it to infer that C.W. was now mentally healthy and no longer posed a threat to the children. The court of appeals' opinion also suggests that the lack of reported domestic violence incidents in Montana should have led the trial court to find that C.W. and mother have addressed their domestic violence issues. However, the CCDHS caseworker testified that CCDHS knew of incidents of domestic violence between C.W. and mother that occurred before they moved to Montana and went unreported to law enforcement. Thus, the trial court could reasonably conclude that the lack of reported incidents of domestic violence since C.W. and mother moved to Montana did not necessarily indicate the relationship was now violence free. Further, ample evidence in the record shows that C.W.'s ability to safely parent his newest child does not necessarily mean he could now safely be involved in son and daughter's lives. Nor does mother's ability to parent the new child mean she can safely parent son and daughter. The psychologist who evaluated mother and C.W. in Colorado, the certified psychiatric nurse specialist who performed an interactional evaluation of mother and son, and a letter from the consultation team at the Kempe Center for the Prevention and Treatment of Child Abuse and Neglect all indicated that the ability to safely parent one untraumatized child should not be considered evidence that a parent can safely care for other children who suffered abuse and neglect at that parent's hands. Therefore, the trial court could reasonably conclude that evidence of C.W.'s ability to parent his newest child did not require it toinfer that his presence in the home would be safe for son and daughter, or that mother could safely parent them. Finally, and perhaps most importantly, the court of appeals erred in placing more weight on testimony and reports from SWCD providers regarding mother's honesty. Weighing the evidence is a trial court function. The trial court found against mother's credibility and the evidence supports its evaluation of her honesty. The record contains testimony and other evidence that mother regularly engaged in "splitting" behavior, whereby she reported different versions of events and different explanations for her behavior to different people. The record does not reveal that SWCD acknowledged the pervasiveness of this tendency in mother and instead shows that SWCD providers believed mother's self-reports despite warnings from the CCDHS treatment team of her propensity to lie and withhold important information. Mother's lack of credibility affected her ability to overcome the psychological problems that prevented her from parenting son and daughter and affected the ability of her treatment providers to help her overcome those problems. The trial court interacted with mother for nearly two years. In several instances, collateral sources proved that mother repeatedly lied to mental health professionals and the CCDHS treatment team. Based on this, the trial court could reasonably find that mother's repeated lying deserved more weight than the uncorroborated reports from SWCD that mother was honest. The court of appeals should not have substituted its judgment for that of the trial court. See K.D., 139 P.3d at 702. In sum, the court of appeals erred by substituting its own view for that of the trial court regarding the credibility of witnesses, and the weight, sufficiency, and probative value of the evidence. See id. The trial court reasonably found that the evidence cited by the court of appeals deserved less weight than other evidence in the record. The court of appeals failed to properly apply the "clearly erroneous" standard of review. See C.A.K., 652 P.2d at 613. There is ample evidence in the record to support the trial court's findings and conclusion, based on clear and convincing evidence, that mother was unfit. 2. Unlikely to Change Within a Reasonable Time The trial court found and concluded that mother's conduct or condition was unlikely to change within a reasonable time. It reached this conclusion based on the children's ages and the fact that mother continued to be deceptive and did not facilitate successful completion of her treatment plan. Relying on the same evidence discussed supra, the court of appeals held that the trial court could not have reasonably concluded, based on clear and convincing evidence, that mother's conduct or condition was unlikely to change within a reasonable time. As we explained above, we conclude that the court of appeals improperly substituted its judgment for that of the trial court regarding the credibility of witnesses and the weight, sufficiency, and probative value of the evidence. See K.D., 139 P.3d at 702. Deferring to the weight the trial court assigned to the evidence before it, we determine that evidence in the record supports the trial court's finding and conclusion, by clear and convincing evidence, that mother's conduct or condition is unlikely to change within a reasonable time. Testimony from experts at trial, as well as other evidence in the record, established that mother could not effectively parent son and daughter until she acknowledged the harm she had caused them. The trial court could reasonably find and conclude, by clear and convincing evidence, that mother's conduct or condition would not change until she acknowledged the harm caused to son and daughter by her abuse and neglect. As noted by the trial court, this case had been pending for two years at the time of the hearing. At the hearing, mother's testimony revealed that she continued to deny she physically abused son and daughter. Testimony from her oldest child's therapist showed that, rather than acknowledge her abuse of him, she wanted the opportunity to confront the child about his allegations. Atthe time of trial, mother had not responded to a letter sent months earlier by that child requesting that she apologize for a discrete set of abusive acts against him. Although he is not a subject of this proceeding, evidence of mother's conduct in dealing with him supports the contention that mother continued to deny the harm she caused her children. Based on this evidence, the trial court reasonably found that Mother's conduct or condition had not changed. Because she had made little progress in the two years since her children were removed, the court could also reasonably find and conclude, by clear and convincing evidence, that mother was unlikely to change within a reasonable time. This determination is bolstered by the fact that the children are subject to expedited placement procedures and are at a point in their lives where permanency and establishing attachment to a primary adult is crucially important. See § 19-3-703; § 19-1-102(1.6); K.D., 139 P.3d at 699. What constitutes "a reasonable time" is relative and should be determined based on the children's physical, mental, and emotional conditions and needs. K.D., 139 P.3d at 700. In this case, the trial court could reasonably find and conclude that the children's age and need for permanency precluded giving mother more time to address her mental health needs. We hold that the court of appeals erred by substituting its opinion for that of the trial court regarding the credibility of witnesses, and the weight, sufficiency, and probative value of the evidence. See K.D., 139 P.3d at 702. We conclude that the court of appeals did not properly apply the "clearly erroneous" standard of review. See C.A.K., 652 P.2d at 613. There is ample evidence in the record supporting the trial court's findings and conclusion, by clear and convincing evidence, that mother's conduct or condition was unlikely to change within a reasonable time.
Conclusion In sum, we conclude that the trial court's findings are supported by the record.
III. Accordingly, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court terminating the parent-child legal relationships. * Justice Márquez does not participate. 1 We granted certiorari on the following issue: whether the court of appeals applied the proper standard of review in reversing the trial court's decision to terminate parental rights. 2 That child is not a subject of this proceeding. 3 C.W.'s daughter T.M.W. was previously ordered into temporary protective custody. 4 We disagree with the court of appeals' concern that mother's ability to present evidence was hampered by the fact that very few visitations between mother, son and daughter were granted once mother moved to Montana. Where there is substantial evidence in the record supporting the contention that visitation would not be in the child's best interests, we will not require the county or the court to experiment with the child by granting visitation. See L.D., 671 P.2d at 945. In this case, there was substantial evidence supporting the denial of visitation, including testimony from experts and specialists regarding the harmful emotional impact on the children of mother's denial of the abuse she inflicted on them. Thus, we do not conclude that the trial court's finding of clear and convincing evidence was affected by the lack of visitation granted mother.